UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAMES R. CLAIRMONT,

                                        Petitioner,

                                                                9:12-CV-01022

v.
                                                                (GTS/TWD)

J.T. SMITH,

                                        Respondent.
_____

APPEARANCES:                            OF COUNSEL:

JAMES R. CLAIRMONT
09-A-2043
Petitioner *pro se*
Shawangunk Correctional Facility
P.O. Box 700
Wallkill, New York 12589

HON. ERIC T. SCHNEIDERMAN              PAUL B. LYONS, ESQ.
Attorney General for the State of New York
Counsel for Respondent
120 Broadway
New York, New York 10271


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER and REPORT-RECOMMENDATION**</u>

## I.      Introduction

        This matter has been referred to this Court for Report and Recommendation, pursuant to

28 U.S.C. § 636(b) and Northern District Local Rule 72.3(c), by the Hon. Glenn T. Suddaby,

United States District Judge.

        Presently before this Court is the timely Petition of Petitioner James R. Clairmont,

seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (Dkt. No. 1.)  Petitioner brings

this proceeding challenging a judgment of conviction entered on April 13, 2009, following a January 2009 jury trial in Saratoga County Court. (Dkt. No. 16-3 at 1[1]). Petitioner was convicted of three counts of Criminal Sexual Act in the First Degree (N.Y. Penal Law § 130.50(1)), three counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(1)), and two counts of Assault in the Third Degree (N.Y. Penal Law § 120.00).[2] (Dkt. No. 16-3 at 674, 685.) Petitioner was sentenced to a determinate prison term of eighteen years followed by twelve years of post-release supervision on the three counts of Criminal Sexual Act in the First Degree; a determinate sentence of five years followed by a period of post release supervision of ten years on the three counts of Sexual Abuse in the First Degree; and local terms of one year on each of the two counts of Assault in the Third Degree. *Id*. at 707-09. The terms run concurrently. *Id.* at 709.

The Appellate Division Third Department ("Appellate Division") unanimously affirmed the judgment of conviction on July 22, 2010, and leave to appeal to the New York Court of Appeals was denied on November 4, 2010. *People v. Clairmont*, 906.Y.S.2d 369 (3rd Dep't 2010), *lv. denied*, 913 N.Y.S.2d 646 (2010). Petitioner is currently incarcerated in Shawangunk Correctional Facility pursuant to the conviction. (Dkt. No. 1 at 1.)

Petitioner has raised three grounds for habeas review:

    (1)    Violation of his Fourteenth Amendment right to due

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2] A charge of Rape in the First Degree (N.Y. Penal Law § 130.35(1)) was withdrawn by the prosecution during the proceedings. (Dkt. No. 16-3 at 535.) Petitioner was found not guilty on the charge of Unlawful Imprisonment in the Second Degree (Penal Law § 135.05(1)). (Dkt. Nos. 16-3 at 674.)

process based upon a claim that the prosecution adduced perjured material testimony from the prosecution's main witness at trial in order to obtain a conviction (Dkt. No. 1 at 4);

(2)     Violation of his Fourteenth Amendment due process rights by the prosecution in allowing perjured testimony by a prosecution witness to go uncorrected while having a professional obligation to correct perjured/tainted testimony for the jury and court, *id*.; and

(3)     Petitioner's conviction was the result of a verdict not supported by the weight of the evidence by federal standards, *id*. at 5.

For the reasons discussed below, the Court recommends that Petitioner's Petition (Dkt. No. 1) be denied and dismissed in its entirety.

## II.     Factual Background

### A.     The People's Case

Petitioner and J.S.[3] met during the Summer of 2007 at a trailer park in Wilton, New York where Petitioner lived and worked and J.S. was living with her mother.  (Dkt. No. 16-3 at 319-20.)   In October of 2007, after the two had dated for a short time, J.S., whose mother was moving out of state, began living with Petitioner.  *Id*. at 308, 320-22.  Although things initially went okay, by onset of winter, Petitioner had begun to show controlling and violent tendencies. *Id*. at 322.   On one occasion, when J.S.'s paycheck did not arrive in the mail on time, Petitioner accused her of taking it out of the mailbox and spending it, even though she had no access to the mailbox for which he had the key.  *Id*. at 323-24.  Petitioner became violent, hitting her in the head.  *Id*. at 324-25.

---

[3]  The victim is identified herein as J.S. in order to protect her privacy.

1. <u>December 21, 2007, Assault</u>

J.S. and Petitioner went to visit his parents at their residence behind Petitioner's mobile home in the trailer park on the evening of December 21, 2007.  *Id*. at 326-27.  Petitioner's brother Jason was there, and everyone was drinking.  *Id*. at 327; 543.  When Jason had to leave, he helped J.S. move Petitioner's new car, which was parked behind his, when she was unable to shift the vehicle into reverse.  *Id*. at 327-29.  Petitioner came out of the house angry and accused J.S. of sleeping with his brother.  *Id*. at 329.  Petitioner took J.S. by the hair and dragged her out of the car and began hitting as he continued to accuse her of sleeping with his brother.  *Id*.  When she tried to get up, Petitioner threw her back down and started kicking her in the sides and back.  *Id*. at 330.  Petitioner followed J.S. when she went into his parents' residence and put her head through the kitchen window.  *Id*. at 331.

New York State Troopers Kevin Manion ("Manion") and Brandon Hudson arrived and began speaking with everyone.  *Id*. at 331.  When J.S., who appeared intoxicated, went over to Manion, he noticed that some of her hair was missing and asked her what had happened.  *Id*. at 273.  Manion testified that J.S. became belligerent and ultimately was arrested, handcuffed, and charged with disorderly conduct and resisting arrest.  *Id*. at 273-74, 332.  When he took J.S. to the State Police barracks, he noticed she was "missing a half a head of hair," and asked her what had happened to it.  *Id*. at 275-76.  J.S. told him she got it caught in the car door.  *Id*. at 276.

Based upon J.S.'s crying and his experience with domestic incidents, Manion believed something was wrong.  *Id*.  Manion told J.S. he did not believe she caught her hair in the door because she would have had more injuries, and crying the whole time, J.S. told Manion she did not want to talk to him.  *Id*. at 277.  According to J.S., she did not say anything about Petitioner

and her hair because she was afraid. *Id*. at 363. Manion did not believe it was right for J.S. to go

home that night and arranged for her to stay at a hotel. *Id*. at 280-81. Manion told J.S. he was

always available if she changed her mind and wanted to talk to him about what had happened.

*Id*. J.S. went home to Petitioner the following morning. *Id*. at 334. J.S. was never arraigned on

the disorderly conduct and resisting arrest charges, and the charges were dismissed at Manion's

request. *Id*. at 302.

According to J.S., the abuse continued after the incident on December 21, 2007.

Sometime between the December 21, 2007, incident and early February 2008, J.S. went outside

to get some air. *Id*. at 337. Petitioner kicked her in the shin causing her to fall. *Id*. J.S. got up

and tried to walk away. *Id*. When she was a little ways down the street, Petitioner came up on

his child's bike and hit J.S. in the nose. *Id*. at 337-38. J.S. flew back and landed on the ground.

*Id*. at 338. She went to the house, with her nose bleeding profusely. *Id*. She thought it was

broken. *Id*.

### 2. February 15, 2008, Assault

On February 15, 2008, J.S. was awakened at 2:00am by Petitioner who was yelling and

screaming at her. *Id*. at 339. He accused J.S. of having said "Mike, I love you" while she was

sleeping. *Id*. at 340. Petitioner went into the living room and continued yelling, calling J.S. a

whore. *Id*. Petitioner came back into the bedroom and began hitting J.S. in the head. *Id*. at 341.

He hit J.S.'s hand when she used it to block him from hitting her in the head. *Id*. Petitioner

began kicking J.S. in the back and ribs after she started protecting her head and told her that

women who cheated on their husbands deserved to be treated like that. *Id*. He continued calling

J.S. a whore and a slut. *Id*.

Petitioner then forced J.S. to have anal sex with him by holding her wrists as she lay on her stomach. *Id*. at 342, 345. J.S., who was crying and in great pain, tried not to say anything because she was already afraid for her life and did not want to make things worse. *Id*. at 342. After ejaculating, Petitioner went back into the livingroom. *Id*. at 342, 345. J.S. sat on the edge of the bed and did not try to go anywhere because she was afraid. *Id* . at 343. She became really frightened when she heard Petitioner screaming   calling J.S. a whore and a slut and saying she deserved to be treated the way he was treating her. *Id*. at 344.

Petitioner came back in the bedroom and forced J.S. to felate him, telling her to get it hard for him like a good little whore. *Id*. J.S. did it despite not wanting to because she did not want him to hit her any more. *Id*. Petitioner did not ejaculate. *Id.* Petitioner then threw J.S. on the bed and forced her to have anal sex with him again, this time placing her on her back and putting her legs up so that her knees were by her head. *Id*. at 445. J.S. was afraid that Petitioner would start beating her again so she did not fight and said nothing. *Id*. at 346. Petitioner ejaculated and again went into the livingroom. *Id.*

J.S. did not leave the trailer. *Id* at 347. She felt that if she stayed in one spot he would not do anything more to her. *Id*. She could hear Petitioner call in late for work and was fearful because she thought it meant that he was going to continue to keep doing things to her until he left. *Id*. at 348. Petitioner then told her not to leave because he would know if she did, and he was not done with her. *Id*.

After Petitioner left, J.S. called some friends and, when no one answered, called her mother in Oklahoma. *Id.* at 349. After she spoke with her mother, J.S. packed her bags and went to her neighbor's house. *Id*. J.S. knocked on her neighbor Deborah Woodcock's ("Woodcock")

door at about 8:00am.  *Id.* at 404.  J.S. was crying and asked if she could stay at her house.
Woodcock said yes and asked her what was going on.  *Id.*  J.S. told Woodcock about Petitioner
waking her up at 2:00am and severely beating her.  *Id.* at 405.  J.S. said she had spoken with her
mom and the police were coming.  *Id.*

J.S. was at Woodcock's when Manion, who had received a call regarding a possible
domestic violence victim, arrived at the trailer park.  *Id.* at 283-84.  J.S., who was crying, told
Manion that Petitioner had beaten her, and he observed that she was injured and called for an
ambulance.  *Id.* at 284-85.  On the way to the hospital, J.S. told paramedic Jared Gilston
("Gilston") that Petitioner had physically and sexually assaulted her.  *Id.* at 465.  She was at
times withdrawn and at other times upset and crying and "kind of hyperventilating" with labored
breathing.  *Id.* at 473.  Gilston asked J.S. if she wanted him to recontact the police so that they
could meet her at the hospital, and she said she did.  *Id.* at 466.

When Manion arrived at Saratoga Hospital he was informed that in the ambulance on the
way to the hospital, J.S. had disclosed that Petitioner had raped her.  *Id.* at 286-87.  Manion then
spoke with J.S. who told him she had been beaten and raped by Petitioner.  *Id.* at 287.  State
Police Investigator Barber told Manion to obtain a sexual assault evidence kit.  *Id.*

Saratoga Hospital Registered Nurse Kerry Button ("Button") interviewed J.S. in the
Emergency Room.  *Id.* at 488.  J.S. told Button about the anal intercourse.  *Id.* at 489.  J.S.
described two instances of anal intercourse and two instances of physical assault.  *Id.*  J.S.'s
affect was flat, she was very withdrawn without a lot of emotion on her face, made minimal eye
contact, and was at times openly weeping.  *Id.* at 490-91.  After the evidence kit was complete,
J.S. was examined by Dr. Duthaler for complaints of hand, side, and abdominal pain.  *Id.* at 511.

She complained of pain in the left rib area, left side of her abdomen, and her right hand. *Id*. at 512. J.S. told Dr. Duthaler that she had been both physically and sexually assaulted by Petitioner, that he had kicked and punched her and forced her to have anal and oral sex. *Id*. at 513. The physical findings were consistent with bruising on J.S.'s body and areas of tenderness with no bruising. X-rays and a CT scan showed no fractures or signs of internal injury. *Id*. at 514-15.

J.S. was discharged from the hospital at 4:34pm, taken to the State Police barracks by Manion, and interviewed for two hours by Bureau of Criminal Investigations Investigator David Pelchar ("Pelchar"), who took a statement from her before taking her to a friend's house. *Id*. at 289, 353-54, 412-13, 517. Except for going with Pelchar to pick up a few things the following day, J.S. never returned to Petitioner's home. *Id*. at 358. She moved to Oklahoma where her mother was living. *Id*. at 358-59.

3.     Controlled Phone Call

While J.S. was being interviewed by Pelchar, she was receiving messages on her cell phone from Petitioner. *Id*. at 413. Pelchar asked J.S. if she would be willing to do a controlled phone call with Petitioner in which she would confront him about the assault. J.S. agreed to return to the barracks and do the call the next morning. *Id*. at 356, 413. J.S. returned to the barracks the morning of February 16, 2008, and made the controlled phone call. *Id*.

On direct examination, Petitioner's attorney questioned him about the controlled phone call, asking him if he responded when J.S. asked "Jimmy, why did you hurt me."[4] *Id*. at 549.

---

[4] As noted in Respondent's Memorandum of Law, the transcript of the recording of the call was not read into the record at trial. (Dkt. No. 15 at 12 n.4.) The cassette tape of the conversation was, however, admitted into evidence at trial and played for the jury. (Dkt. No. 16-

Petitioner testified that he supposed he responded with an "I'm sorry," that he was just sorry for having an argument and just having problems and was sorry that everything wasn't good. *Id*. Petitioner denied admitting to anything, testifying that he was just trying to make J.S. happy. *Id*. at 550. Petitioner elaborated, testifying If that he was busy driving a forklift at the time, and it was hard for him to pay attention to the conversation. *Id*.

On cross-examination, Petitioner acknowledged that it was his voice on the recording of the controlled phone call and that he heard on the tape that J.S. had said "You forced yourself on me," and he had responded "I'm sorry." *Id*. at 564-65. Petitioner claimed, however, that he wasn't really paying attention and would have agreed to anything she said just to make her happy. *Id*. at 565. Petitioner admitted saying on the tape that he had anger problems, and telling J.S. that "[i]t's not going to happen again" but again claimed to have said it only to make her happy. *Id.* at 566-67. Petitioner also acknowledged saying on the tape that he was in a fit of rage during the early morning of February 15, 2008. *Id*. at 568. When asked if it was true that when J.S. asked "[w]hy did you hit and kick me like this . . . like that," he responded "I'm sorry," Petitioner testified that half the time he did not hear what J.S. was saying, and he would have said "I'm sorry" a million times over just wanting to apologize. *Id*. at 571.

3 at 415-17.) Petitioner was questioned about the taped conversation on both direct and cross-examination at trial, *id*. at 549, 563-71, and the Appellate Division recounted its contents in its decision on Petitioner's direct appeal. *See People v. Clairmont*, 906 N.Y.S.2d 369, 372 (3rd Dep't 2010). Petitioner has not disputed the Appellate Division's summary of the phone call. 28 U.S.C. § 2254, Rule 5 provides that "If a transcript cannot be obtained . . . a narrative summary of the evidence [may be submitted]." *See Douglas v. Portundo*, 232 F.Supp. 2d 106, 109 n.1 (S.D.N.Y. 2002) (factual submissions by parties in district court and on direct appeal found sufficient to resolve petitioner's claims where the court did not have the trial transcript). The Court finds that the current record suffices to resolve Petitioner's claims, particularly since the substance of the recorded conversation is not in dispute.

In its decision on Petitioner's appeal from his criminal conviction, the Appellate Division wrote regarding the taped phone conversation:

> During this conversation, defendant repeatedly apologized to the victim for the events of February 15, 2008, including the physical abuse and the anal sex, and admitted that "[i]t was wrong of [him]" to have forced himself on her. He also told her that he has "anger problems," that [he's] not going to put [his] hands on her again" and that "if [she] really loved [him] . . . [she] would stick by [his] side and see if [he] could get some help.

*Clairmont*, 906 N.Y.S.2d at 372.

4.     Petitioner's Arrest

On February 19, 2008, State Police Investigators Andrew Werner ("Werner") and Robert Stamfli ("Stamfli") went to Petitioner's place of employment to speak with him. (Dkt. No. 16-3 at 423-24, 431, 434.) Werner was the case agent on the case involving J.S. and had asked Stamfli to accompany him. *Id*. at 423, 432. Werner informed Petitioner that he needed to talk to him about a sexual assault investigation. *Id*. at 434. When Petitioner declined Werner's request to go to the Wilton barracks to speak with them about the investigation, Werner placed him under arrest, put him in handcuffs, and brought him over to his car. *Id*. Werner advised Petitioner of his *Miranda* rights. *Id.* at 425, 435-38.

While in the car, Petitioner acknowledged that he and J.S. had argued, but claimed that he never put his hands on her, and he swore on his son's life he would never do that. *Id.* at 425-26, 439. He told the investigators that he had awakened J.S. at 2:00am because she was talking in her sleep, and he thought she was cheating on him with Mike, the maintenance man in the trailer park. *Id*. at 426, 439. Petitioner said he might have called her a whore but that he would never put his hands on her. *Id.* Petitioner told the investigators "I'm verbally abusive to her but not

10

physically abusive." *Id*. at 426.

When they arrived at the barracks, Werner began interviewing Petitioner, who continued to deny ever physically assaulting J.S. in any way. *Id*. at 440. Werner then played Petitioner the part of the recorded phone call in which he talked about how he did assault J.S. *Id*. at 441. Petitioner then said "Well, yes, I did put my hands on her, but I didn't hurt her. I wouldn't do that." *Id.*

Petitioner told Werner that he and J.S. had anal sex that morning, and that they had sex every morning. *Id*. He claimed to have asked J.S. if she wanted to have sex and that J.S. had said yes. *Id*. After being told by Petitioner that J.S. liked anal sex, Werner asked him about the part of the tape where she said she did not like it, to which he responded that she did like it. *Id*. at 442. After being told of the charges that would be placed against him, Petitioner requested an attorney and indicated he did not want to talk any more. *Id*. at 422. Petitioner was given a cell phone to call an attorney and the interview ended. *Id*.

**B.     Petitioner's Case**

Petitioner testified on his own behalf at trial. (Dkt. No. 16-3 at 539-577.) Petitioner testified that he met J.S. in April or May of 2007, and that they lived together from approximately August of 2007 through February 2008. *Id.* at 541. The two shared the same bed and had consensual sex on a daily basis, and there was never a time that J.S. told him she did not want to have sex with him, said no, or asked him to stop. *Id*. at 542, 548.

According to Petitioner, he and J.S. went to his parents' home on December 22, 2007, to show them the car he had acquired that day. *Id*. at 543. They both started drinking beer and shots, and drank a lot. *Id*. Petitioner and J.S. both became drunk. *Id*. The State Police came to

the house, and J.S. was arrested. *Id*. at 543-44. Petitioner did not see J.S. interact with the State Police. *Id*. at 544. The State Police took J.S., and she called Petitioner from a hotel the next morning and later came home. *Id*. When asked about the testimony regarding J.S.'s loss of hair on December 22, 2007, Petitioner said that he was heavily intoxicated that night and had no idea how it had happened. *Id*. at 556.

According to Petitioner, he and J.S. had a verbal argument in the middle of the night on February 15, 2008. *Id*. at 547. He was not sleeping before the argument. *Id*. at 562. J.S. got up to go to the bathroom and the argument started. *Id*. Petitioner does not believe he started the argument. *Id*. Petitioner and J.S. ended up arguing for a couple of hours before he went to sleep. *Id*. at 547.

The next morning, Petitioner had anal sex with J.S. with her consent. *Id*. She did not say no or tell him to stop, nor did she scream or yell at him about it. *Id*. at 547-48. Afterwards they had coffee as they always did, and Petitioner asked J.S. if she was still going to have sex with him, and she said "Yes, sir (sic), of course, I love you." *Id*. at 547.

J.S. called Petitioner the next morning while he was at work. *Id*. at 548. His boss did not like him to talk on the phone while he was working, and he was on the forklift when J.S. called. *Id*. However, Petitioner felt it was important to speak with her because he cared about her and wanted to work something out. *Id*. at 548-49. During the conversation, Petitioner acknowledged telling J.S. he was sorry for hurting her when she asked him why he had hurt her. *Id*. at 549. When asked why he apologized, Petitioner testified: "To tell you the truth. sir, I was busy with the forklift. I wasn't really paying attention. I just wanted to make her happy and, you know,

just didn't want to have any problems. I was pretty much going to tell her I was sorry for anything at that point." *Id*. at 549.

Petitioner denied hitting J.S. on February 15, 2007, or ever beating her up. *Id*. at 550-51. He described what had happened as "a shoving match and a pushing match." *Id*. at 550. Petitioner also denied raping J.S. on February 15, 2008, or forcing her to have sex with him. *Id.* at 556. Petitioner testified that the trailer where the two lived had three doors, it was simple to get out, and he did not restrain J.S. from leaving the trailer on February 15, 2008, or at any other time. *Id*. at 545-46.

### III.   Direct Appeal and State Court Post-conviction Proceeding

#### A.   Direct Appeal

The issues raised by Petitioner on his direct appeal to the Appellate Division included whether: (1) his conviction was the result of a verdict not supported by legally sufficient evidence on the issue of forcible compulsion; (2) his conviction was not supported by the weight of the evidence on the question of whether the sex was consensual; (3) his conviction was the result of a verdict obtained through the People's prejudicial conduct during closing; and (4) his sentence was harsh and severe. (Dkt. No. 16-1 at 20-28.)

The Appellate Division unanimously affirmed the judgment of conviction entered against Petitioner. *People v. Clairmont*, 906 N.Y.S.2d 369 (3d Dep't 2010) On the issue of the legal sufficiency of the evidence on the issue of forcible compulsion, the Appellate Division considered the testimony given by J.S. which was found to be strongly supported by the taped phone conversation; the testimony of the nurse and doctor who examined J.S. in the emergency

room; testimony regarding the abusive and controlling history of the relationship; and the state of mind produced in J.S. by Petitioner's conduct in concluding that

> viewing the evidence in a light most favorable to the People and giving them the benefit of every favorable inference, we find that there is a "valid line of reasoning and permissible inferences which could lead a rational person to the conclusion" that the element of forcible compulsion was established by the trial evidence. (*People v. Thompson*, 72 N.Y.2d 413, 534 N.Y.S.2d 132, 530 N.E.2d 839, quoting *People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987)[.]

*Id.* at 373. On the question of the sufficiency of the weight of the evidence, the Appellate Division noted that while a different verdict would not have been unreasonable, "upon our review of all the credible evidence in a neutral light, and according great deference to the jury's resolution of issues of credibility, we find the verdict to be supported by the weight of the evidence." *Id.*

The Appellate Division found that Petitioner's assertion that the prosecutor made improper and prejudicial comments during summation had not been preserved for review due to the failure to object, and that in any event the comments in summation constituted fair comment on the evidence or a proper response to Petitioner's summation. *Id.* The Court concluded that "in light of the circumstances of the present crimes, [Petitioner's] criminal history and the absence of extraordinary circumstances, we do not find the sentences imposed by County Court to be harsh and excessive."[5] *Id.*

Petitioner sought leave to appeal to the Court of Appeals asking the Court to adopt the rule that "[s]ince a person is directly and immediately aware of his/her mental state, when a

---

[5] Petitioner had prior convictions for reckless endangerment, disorderly conduct, and possession of a forged instrument. (Dkt. No. 16-3 at 555.)

person delays in expressing his/her mental state (no consent), forcible compulsion should not be available as a proof to infer that there was no consent." (Dkt. No. 16-1 at 82-83.) Petitioner also argued that his conviction stood below the federal [sufficiency of the evidence] standard enunciated in *In Re Winship*, 397 U.S. 358 (1970). *Id*. at 83. The Court of Appeals denied leave to appeal on November 4, 2010. *People v. Clairmont*, 913 N.Y.S.2d 646 (2010).

### B. Section 440.10 Motion to Vacate Judgment of Conviction

Petitioner moved *pro se* to vacate the judgment of conviction under N.Y. Criminal Procedure Law ("CPL") §440.10 on August 2, 2011. (Dkt. No. 16-1 at 87.) The stated grounds for the motion were that: (1) the prosecution used perjured testimony to obtain the conviction in violation of his Fourteenth Amendment rights; and (2) ineffective assistance of defense counsel. *Id*. at 88. Petitioner argued that J.S.'s testimony was rendered incredible as a matter of law by her telling more than one version of the facts and giving perjured testimony at trial regarding (1) drinking and her interaction with the State Troopers that led to her arrest for disorderly conduct and resisting arrest on December 22, 2007; and (2) her testimony that Petitioner's controlling behavior forced her to quit her job. *Id*. at 93. Petitioner accused the prosecution of allowing the perjured testimony to continue so as to obtain a conviction and relying upon perjured testimony to support the conviction on the appeal to the Appellate Division. *Id*. at 93-94. Petitioner claimed that his Fourteenth Amendment rights were violated because without J.S.'s tainted and unbelievable testimony, the prosecution could not have obtained a conviction. *Id*. at 92.

Petitioner claimed ineffective assistance of counsel by virtue of his defense counsel's failure to object to improper statements in the prosecution's summation. (Dkt. No. 16-1 at 110.)

Petitioner also claimed ineffective assistance of counsel based upon his counsel's failure to object to J.S.'s alleged inconsistent/perjured testimony. *Id.*

On November 23, 2011, a counseled § 440.10 motion was made bolstering Petitioner's *pro se* motion argument that his conviction should be vacated on the ground that material evidence adduced at trial was false and known to the prosecutor to be false, resulting in a judgment of conviction that was procured in violation of Petitioner's rights under the New York or United States Constitutions.[6] *Id*. at 113-14. The motion identified four examples of claimed inconsistent/false testimony. *Id*. at 120-22.

The first example, also relied upon in Petitioner's *pro se* motion, was J.S.'s testimony regarding her drinking, her behavior and her interaction with the State Troopers on the evening of December 21, 2007. *Id*. at 120-21. The second example was J.S. initially telling Manion that her missing hair was pulled out when it was caught in a car door and not making a complaint regarding her missing hair until she arrived at the State Police barracks. *Id*. at 121. The third example was J.S.'s testimony that she only had three or four beers when Manion testified J.S. appeared intoxicated. *Id*. at 122. The fourth example of inconsistent/false testimony was Petitioner's initial testimony that she had to quit her job in late 2007 because of Petitioner's controlling behavior, her testimony on cross-examination that she worked on Valentine's Day in 2008, and her testimony that she did not specifically remember testifying on direct that she was not working. *Id*.

---

[6] Petitioner's counseled motion did not include an ineffective assistance of counsel claim. (Dkt. No. 16-1 at 113-14.)

16

On March 28, 2012, the Hon. Jerry J. Scarano, Saratoga County Court Judge, denied

Petitioner's § 440.10 motion. (Dkt. No. 16-1 at 175-76.) Judge Scarano found that

> [t]he Defendant's motion [to vacate based upon J.S.'s
> alleged perjury with the prosecutor's knowledge] is premised upon
> his own conclusory, self-serving affidavit. His unsupported
> assertions are discredited by an examination of the record as a
> whole. What defendant characterizes as false or perjured
> testimony by the victim is belied by the record of this proceeding.
> The jury found the testimony of the victim to be credible, as did the
> appellate court . . . . Thus, this Court finds defendant's claim is
> without merit. CPL § 440.20(2); CPL § 44.30(4).

Petitioner's ineffective assistance of counsel argument was rejected by the County Court

based upon: (1) the appellate court's finding that the prosecutor's comments in summation

constituted "fair comment on the evidence"; and (2) defense counsel's argument throughout his

summation that J.S. had lied and was unbelievable. *Id*. at 176.

Petitioner's motion for leave to appeal from the denial of his § 440.10 motion was denied

by the Appellate Division on June 7, 2012. *Id*. at 179-83, 192.

## IV. Standard of Review

### A. Exhaustion Requirement under the Antiterrorism and Effective Death Penalty Act of 1996

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs

applications of incarcerated state court defendants seeking federal habeas corpus relief. *See* 28

U.S.C. § 2254. Before a federal court may consider an application for habeas corpus relief

pursuant to 28 U.S.C. § 2254, the petitioner must generally have exhausted all the remedies

available in the courts of the state in which he or she was convicted.[7] 28 U.S.C. § 2254(b)(1)(A);

---

[7] Exhaustion may be excused where it appears that "there is an absence of available state corrective process" or "circumstances exist that render such process ineffective to protect the

*see also Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1399 (2011) ("Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief."); *Jones v. Murphy*, 694 F.3d 225, 246-47 (2d Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 1247 (2013) ("Under AEDPA, a prisoner in custody pursuant to a state court judgment must generally exhaust state court remedies before seeking federal habeas corpus review.").

"Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoner's federal rights." *Cornell v. Kirkpatrick*, 665 F.3d 369, 375 (2d Cir. 2011) (citation and internal quotation marks omitted); *Daye v. Attorney General of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*) (proper exhaustion requires that both the factual and legal premises of claim be "fairly presented" to the state court).

> Passage through the state courts, in and of itself, "is not sufficient." *Picard* [*v. Connor*, 404 U.S. 270, 275 (1971)]. To provide the State with the necessary 'opportunity,' the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)."

*Wilens v. Superintendent of Clinton Correc. Fac.*, No. 11-CV-1938 (JFB), 2014 WL 28995, at *5, 2014 U.S. Dist. LEXIS 182111, at *13 (E.D.N.Y. Jan. 2 2014).[8]

---

rights of the applicant." *See* 28 U.S.C. § 2254(b)(1)(B)(i)-(ii).

[8] Copies of unreported cases cited herein will be provided to Petitioner. *See Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Petitioner bears the burden of proving exhaustion. *Colon v. Johnson*, 19 F.Supp. 2d 112, 119-20 (S.D.N.Y. 1998) (citations omitted).

**B.     Review of State Court Decisions on the Merits Under the AEDPA**

Under the AEDPA, an application for a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Recognizing the principle that "[s]tate courts are adequate forums for the vindication of federal rights . . . , AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, ___U.S. ___, 134 S.Ct. 10, 15-16 (2013); *see also Cullen,* 131 S.Ct. at 1398 ("This is a difficult to meet [ ] . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt . . . .") (citation and internal quotation marks omitted).

"For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).  Under the AEDPA, a summary disposition by a state court constitutes a disposition on the merits. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Where AEDPA's deferential standard of review applies, "[a] state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence." *Bierenbaum v. Graham*, 607 F.3d 36, 48 (2d Cir.

2010) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied*, 131 S.Ct. 1693 (2011). "[A] state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 291 (2010).

In determining whether a state court has adjudicated a claim "on the merits," a federal habeas corpus court must classify the state court decision as either (1) fairly appearing to rest primarily on federal law or to be interwoven with federal law; or (2) fairly appearing to rest primarily on state procedural law. *Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006). Decisions in the first category are deemed to have been made "on the merits" of the federal claim. *Id*.

A decision "on the merits" is contrary to clearly established federal law when it is either contrary to Supreme Court precedent on a question of law or opposite to a relevant Supreme Court case with materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). "Section 2254(d)(1)'s 'clearly established' phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citation and internal quotation marks omitted). "[F]ederal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). "[C]ircuit precedent does not constitute clearly established Federal law, as determined by the Supreme Court . . . [and] cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, ___ U.S. ___, 132 S.Ct. 2148, 2155 (2012) (citation and internal quotation marks omitted).

A state court unreasonably applies federal law when it correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner. *Lockyer*, 538 U.S. at 75. An erroneous application of federal law is not necessarily an unreasonable one.[9] *Williams,* 529 U.S. at 413. "It is settled that a federal habeas corpus may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" *Nevada v. Jackson*, ___ U.S. ___, 133 S.Ct. 1990, 1992 (2013) (quoting *Richter*, 562 U.S. at 101). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.

Federal habeas corpus review is limited to determining whether petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. §§ 2241(c), 2254(a); *see also Wainwright v. Goode*, 464 U.S. 78, 83 (1983) ("[F]ederal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension."). Federal habeas relief does not "lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). Petitioner has the burden of proving by a preponderance of the evidence that he is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); *see also Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir. 1999). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice

---

[9] Nevertheless, as interpreted by the Second Circuit, "although some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Mask v. McGinnis*, 252 F. 3d 85, 89 (2d Cir. 2001).

21

system,' not a substitute for ordinary error correction through appeal." *Richter*, 131 S.Ct. at 786.

Where a claim has been adjudicated on the merits by a state court, federal habeas review is

limited to the record that was before the state court that adjudicated the claim on the merits."

*Cullen*, 131 S.Ct. at 1398.

## V.     Petitioner's Perjury and Subornation of Perjury Claims

Petitioner claims, as he did in his unsuccessful *pro se* and counseled § 440.10 motions,

that J.S. committed perjury at trial and that the prosecutor allowed the perjury to go

uncorrected.[10]  (Dkt. Nos. 1 at ¶ 12; 1-1 at 1-26; 5 at 4-6; 16-1 at 92-94, 116-117, 120-123; 17 at

2-8.)  In denying Petitioner's *pro se* and counseled § 440.10 motion, Judge Scarano found

Petitioner's perjury claim to be premised on his own "conclusory, self-serving affidavit"

containing unsupported assertions discredited by the record as a whole, and noted that both the

jury and the Appellate Division had found J.S.'s testimony to be credible.  (Dkt. No. 16-1 at

176.)

### A.     Challenged Testimony

#### 1.     The Evening of December 21, 2007

Petitioner claims that the prosecution knowingly used J.S.'s false, tainted, and

inconsistent testimony regarding the events of the evening of December 21, 2007, in order to

obtain a conviction.  (Dkt. No. 1-1 at 5.)  The claim is based in part upon J.S.'s testimony

concerning her encounter with the State Troopers and Trooper Manion's conflicting testimony

---

[10]  Respondent has conceded that Petitioner exhausted his claims regarding the
subornation of perjury by citing relevant federal law on his *pro se* and counseled § 420.10
motions and raising the perjury claims in his application for leave to appeal to the Appellate
Division.  (Dkt. No. 15 at 22.)

regarding the encounter.  *Id.* at 5-11.  On direct examination, J.S. testified that when the troopers came to the house, she began "acting out," maybe trying to get their attention, and that they arrested her because of her acting out.  (Dkt. No. 16-3 at 332.)  On cross-examination, J.S. testified that she had drunk three, maybe four beers when the troopers arrived.  (Dkt. No. 1-1 at 10.)  When asked, J.S. said she did not believe she was belligerent, and that she cursed at the troopers but did not use some "choice four-letter words."  *Id.* at 10-11.  J.S. denied screaming at the troopers, trying to hit the trooper, and struggling with the troopers when they were trying to handcuff her.  *Id.* at 11, 14.  Petitioner claims that her testimony was shown to be false by Trooper Manion's testimony that J.S. appeared intoxicated, was loud, refused to step away from the car when asked, and pushed Manion's hand away when he put his hands on her to push her away when she was arrested for disorderly conduct and resisting arrest.  *Id.* at 6-7.

Petitioner also claims that J.S. gave different versions of the facts regarding her missing hair to Manion on December 22, 2007.  *Id.* at 9.  Manion testified that J.S. initially told him that her hair had been pulled out by the car door.  *Id.* at 7.  After they arrived at the barracks, she told him a different version of how it had happened.  *Id.* at 8.  J.S. testified on direct examination that she did not recall what she initially told Manion about her hair.  (Dkt. No. 16-3 at 363.)  She testified that she did not say anything about Petitioner at first because she was afraid.  *Id.*  On cross-examination that she did not recall telling the troopers she had caught her hair in the car door before telling them, without specifically mentioning Petitioner's name, that it had been ripped from her head.  *Id.* at 12.

2.        J.S.'s Employment Status

Petitioner further claims that J.S. committed perjury regarding her employment status and having to leave a job because of his controlling nature.  (Dkt. No. 1-1 at 15-25.)  J.S. testified on direct examination that by late December 2007 she had quit her job with an unidentified employer because it was too much of a control issue    that Petitioner was always accusing her of sleeping with other people at work.  (Dkt. No. 16-3 at 335.)  When asked on direct whether she had a job in January and February 2008, J.S. testified she did not.  *Id*. at 336.  She testified that she was not working in February of 2008, and during the day on February 14, 2008, was just at home.  *Id*. at 339.

On cross-examination, J.S. testified that she had worked for RGIS, inventory processing specialists while she was living with her mother in 2007, but that she did not believe she had worked there in 2008.  (Dkt. No. 16-3 at 367.)   J.S. could not remember whether she worked on December 21, 2007, and had no records with that information.  *Id*. at 368.  She testified that she had worked on February 14, 2008, but was not asked where and did not say where.  *Id*.  When defense counsel told her that he thought she had told the court and jury on direct that she had not worked on February 14, 2008, she testified she did not remember specifically telling them she had not worked.  *Id*.

**B.        Analysis**

"When the [Supreme] Court has been faced with a claim by a defendant concerning prosecutorial use of [perjured relevant testimony], it has 'consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside

if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Nix v. Whiteside*, 475 U.S. 157, 185 (1986) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)) ( footnote omitted); *see also Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003) (where the prosecution is found to have failed in its duty to avoid eliciting false testimony, "a new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury.") (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *Drake v. Portuondo*, 553 F.3d 230, 241 (2d Cir. 2009) ("[T]he clearly established Supreme Court precedent relevant to this habeas petition [claiming false testimony] is that the conviction must be set aside if (1) the prosecution actually knew of [the witness's] false testimony, and (2) there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").

However, "the Supreme Court 'has never held that even absent prosecutorial knowledge of perjury at the time of trial, a defendant may establish a due process violation based on perjury on the part of a prosecution witness.'" *Laurey v. Graham*, 596 F.Supp. 2d 743, 766-67 (W.D.N.Y. 2009) (quoting *Penick v. Filion*, 144 F.Supp. 2d 145, 152 (E.D.N.Y. 2001)); *see also Jacobs v. Scott*, 513 U.S. 1067 (1995) (Stevens, J., dissenting from denial of *certiorari*) (noting that the Supreme Court had yet to decide the question of whether a conviction based on perjured testimony violated due process regardless of the prosecutor's knowledge). Therefore, there is no clearly established Supreme Court law holding that the commission of perjury by a prosecution witness without the knowledge of the prosecutor violates due process.

In order to show prosecutorial misconduct with regard to perjured testimony, Petitioner must establish that: (1) false testimony was introduced; (2) the testimony was or should have

been known by the prosecution to be false; (3) the testimony remained uncorrected; and (4) there is a reasonably likelihood that the false testimony could have affected the judgment of the jury. *See Drake,* 553 F.3d at 240-41; *Shih Wei Su,* 335 F.3d at 126.

Petitioner has failed to establish that J.S.'s testimony regarding the events of December 21, 2007, and her employment history was false or perjurious. "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *U.S. v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury. *Id.*

Petitioner's claim that J.S.'s testimony regarding the events of December 21, 2007, was untruthful is not supported by the evidence. Manion testified that J.S. appeared intoxicated, refused his request that she step away from the car, and pushed his hand away. (Dkt. No. 1-1 at 6-7.) J.S. testified that she had three or four beers and "acted out" with the troopers and cursed at them. (Dkt. Nos. 1-1 at 10-11; 16-3 at 332.) The fact that the testimony of Manion and J.S. regarding the incident, while similar, was not identical, fails to prove that J.S. wilfully gave false testimony.

J.S. testified that she did not recall what she had initially told Manion about her hair (that she had caught it in the car door) but acknowledged that she did not initially tell him about Petitioner because she was afraid. (Dkt. Nos. 1-1 at 12; 16-3 at 363.) Manion and J.S. both testified that she told him a different version of how it happened at the barracks. (Dkt. No. 1-1 at 7-8, 12.) Petitioner has presented no evidence supporting his claim that J.S. willfully gave false testimony regarding her hair.

26

Petitioner has likewise failed to establish that J.S. gave wilfully false testimony regarding her employment status. J.S.'s testimony that she left her employment at RGIS by late December 2007 and did not believe she had worked there in 2008 was undisputed. (Dkt. No. 16-3 at 33, 367.) There were inconsistencies in her testimony regarding whether she had been working in February 2008 and specifically on February 14, 2008, but no evidentiary basis exists for determining that she gave wilfully false testimony. *Id.* at 336, 368.

Furthermore, Petitioner has failed to establish that the prosecution knew that J.S. had given false testimony, and he has failed to establish a reasonable likelihood that J.S.'s allegedly false testimony regarding the events of December 21, 2007, her employment status in February 2008 and whether she worked on February 14, 2008, could have affected the jury. The jury was made aware of the inconsistencies in J.S.'s testimony which, as noted above, were brought out in cross-examination and to some extent highlighted by defense counsel in summation, and clearly still found J.S.'s testimony to be credible. (Dkt. No. 16-3 at 594-95, 604.)

Based upon the foregoing, the Court concludes that the Saratoga County Court's denial of Petitioner's *pro se* and counseled § 440.10 motions regarding J.S.'s alleged perjury and the prosecutor's knowing use of the perjured testimony in obtaining Petitioner's conviction was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

## VI.    Petitioner's Weight of the Evidence and Legal Insufficiency Claims

Petitioner claims that his convictions for Criminal Sexual Act in the First Degree (Penal Law § 130.50(1)) and Sexual Abuse in the First Degree (Penal Law § 130.65(1)) were the result of a verdict "not supported by the weight of the evidence by federal standards" with respect to the element of forcible compulsion. (Dkt. No. 1 at ¶ 12.) Petitioner challenged both the legal

sufficiency and weight of the evidence on his direct appeal.[11] (Dkt. No. 16-1 at 3.) The

Appellate Division rejected Petitioner's legal sufficiency and weight of the evidence claims,

finding that despite J.S.'s admission that she did not "tell [Petitioner] 'no' or 'stop' or otherwise

clearly express her unwillingness in some way when [Petitioner's] assaultive conduct    the

'hitting,' 'kicking,' 'yelling,' and 'screaming'    ceased and his sexual conduct began, the

circumstances here were that the state of mind produced in the victim by Petitioner's conduct . . .

rendered the sexual conduct to be without consent due to forcible compulsion, even in the

absence of a clear rebuff by the victim." *People v. Clairmont*, 906 N.Y.S.2d 369, 372 (3d Dep't

2010).

For reasons explained below, the Court further finds that Petitioner's weight of the

evidence claim is unexhausted and is, in any event, a state law claim not cognizable on habeas

review. The Court further finds that the Appellate Division's denial of Petitioner's legal

sufficiency claim was neither contrary to, nor an unreasonable application of, Supreme Court

law.[12]

### A.      Weight of the Evidence

In its decision on Petitioner's direct appeal, the Appellate Division wrote that "while a

different verdict would not have been unreasonable, upon our review of all the credible evidence

in a neutral light, and according great deference to the jury's resolution of the issues of

---

[11] The Court, as has Respondent, construes Petitioner's claim in this proceeding as including a claim of legal insufficiency as well as a weight of the evidence claim. (Dkt. No. 15 at 32 n. 8.)

[12] Respondent concedes that Petitioner's legal sufficiency claim has been exhausted. (Dkt. No. 15 at 22-23.)

credibility, we find the verdict to be supported by the weight of the evidence." *Id.* at 373.

Petitioner presented his weight of the evidence claim on his direct appeal solely under state statutory and case law.[13] (Dkt. No. 16-1 at 25-26.) Because a weight of the evidence claim is a pure state law claim grounded in N.Y. CPL § 470.15(5), Petitioner could not have done otherwise. *See Williams v. Breslin*, No. 06-CV-2479, 2008 WL 4179475, at * 5, 2008 U.S. Dist. LEXIS 78059, at *17 (E.D.N.Y. Sept. 9, 2008) ("A weight of the evidence argument is a pure state law claim grounded in N.Y. C.P.L § 470.15(5), which empowers the intermediate appellate courts of New York to make weight of the evidence determinations."). Since Petitioner's argument that the verdict is against the weight of the evidence states a claim only under state law, it is not cognizable on habeas corpus. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (habeas review is not available to remedy alleged error of state law); *McKinnon v. Superintendent, Great Meadow Correctional Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) (a state weight of the evidence claim is not cognizable on habeas review); *Saunders v. Lavalley*, No. 10-CV-5896 (CS)(LMS), 2014 WL 2624763, at *20, 2014 U.S. Dist. LEXIS 80115, at * 54 (S.D.N.Y. June 10, 2014) ("It is well-settled that weight-of-the-evidence claims are purely state law claims and are not cognizable on habeas review.").

### B.     Legal Insufficiency of the Evidence

On Petitioner's direct appeal, the Appellate Division "viewing the evidence in a light most favorable to the People and giving them the benefit of every favorable inference," found

---

[13] Petitioner's weight of the evidence claim is therefore unexhausted. *See Cornell*, 655 F.3d at 375 (exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts).

that there was a "valid line of reasoning and permissible inferences which could lead a rational person to the conclusion that the element of forcible compulsion was established by the trial evidence." *People v. Clairmont*, 906 N.Y.S.2d at 373 (citations and internal quotation marks omitted).

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court made it clear "that it is the responsibility of the jury — not the court — to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, ___ U.S. ___, 132 S.Ct. 2, 4 (2011). A reviewing court may set aside a jury's verdict on the ground of insufficient evidence only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *see also Hoffler v. Bezio*, 726 F.3d 144, 162 (2d Cir. 2013) ("A defendant challenging the sufficiency of the evidence bears a heavy burden because . . . [the court] must view the evidence in the light most favorable to the prosecution, and doing so, must uphold the jury verdict as long as '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'") (quoting *Jackson*, 443 U.S. at 319) (emphasis in original).

Furthermore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos*, 132 S.Ct. at 4 (quoting *Renico v. Lett*, ___ U.S. ___, 130 S.Ct. 1855, 1862 (2010) (internal quotation marks omitted). The habeas court must be doubly deferential to state court determinations denying legal insufficiency claims — applying the deference to state

court decisions required under § 2254(d) to the state court's already deferential review under *Jackson*. *Id.* at 6.

Under *Jackson*, a habeas court is required to first look to state law for the substantive elements of the crime at issue. *Jackson*, 443 U.S. at 324 n.16. A person is guilty of Criminal Sexual Act in the First Degree when "he or she engages in oral sexual conduct or anal sexual conduct with another person . . . [b]y forcible compulsion." N.Y. Penal Law § 130.50(1). A person is guilty of Sexual Abuse in the First Degree when "he or she subjects another person to sexual conduct . . . [b]y forcible compulsion." N.Y. Penal Law § 130.65(1). Under New York law, the term "forcible compulsion" means "to compel by either . . . use of physical force; or . . . a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person, or in fear that he, she or another person will immediately be kidnaped." N.Y. Penal Law § 130.00(8).

The proper focus in determining forcible compulsion is "the state of mind produced in the victim by the defendant's conduct, because the *sine qua non* for criminal liability for sex offenses under [New York] Penal Law is lack of consent, resulting from either forcible compulsion or incapacity to consent." *People v. Thompson*, 534 N.Y.S.2d 132, 134 (1988); *see also People v. Davis*, 799 N.Y.S.2d 324, 325-26 (3d Dep't 2005) ("Focusing on the evidence establishing the state of mind of the victim caused by defendant's conduct, that is, not what the defendant would or could have done but rather what the victim observing the defendant's conduct, feared he would or might do if the victim did not comply with his demands . . . , we consider, among other factors, the victim's age, the size and strength of the victim and defendant and the nature of their relationship.") (internal citations, quotation marks, and punctuation omitted); *People v. Smith*,

756 N.Y.S.2d 290, 292 (3d Dep't 2003) (finding that forcible compulsion was established although the victim admitted that she refrained from struggling or crying out during the incident, where she testified it was because she was afraid of the defendant because he was much larger than she). The testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction. *See U.S. v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979) (*per curiam*). That is so even if the witness's testimony is not entirely consistent. *See Hogan v. West*, 448 F. Supp. 2d 496, 514 (W.D.N.Y. 2006).

According to J.S., Petitioner forced her to have anal sex twice and to felate him once on February 15, 2008. (Dkt. No. 342, 344-45.) Petitioner did not dispute that he engaged in anal sex with J.S. on February 15, 2008, claiming that it was consensual. (Dkt. No. 16-3 at 547.) J.S. testified that the first time Petitioner forced her to have anal sex, he put her on her stomach and held her wrists. (Dkt. No. at 342, 345.) J.S., who was alone in the trailer with Petitioner, tried not to say anything because she was afraid for her life because Petitioner, who by his own admission was a "good-size[d] man" significantly stronger than J.S., had already yelled and screamed at her, hit her in the head, and kicked her in the back and ribs, and she did not want to make things worse. *Id*. at 341-42, 550-51. When Petitioner told J.S. to felate him, she did it because she did not want him to hit her any more. *Id*. at 344. The second time he forced J.S. to have anal sex, Petitioner threw J.S. on the bed, placed her on her back and put her legs up so that her knees were by her head when he had anal sex with her. *Id*. at 445. J.S. testified that she said and did nothing because she was afraid Petitioner would start beating her again. *Id*. at 346.

As the Appellate Division concluded, *People v. Clairmont*, 906 N.Y.S.2d at 372, J.S.'s testimony was strongly supported by her taped telephone conversation with Petitioner the

following day in which Petitioner repeatedly apologized for the acts about which J.S. testified. (Dkt. No. 16-3 at 549-50, 564-71.)  The testimony of the paramedic in the ambulance and the nurse and doctor who had examined J.S. at Saratoga Hospital likewise supported J.S.'s account of the physical and sexual assault.  *Id*. at 465-73, 488-89, 511-12.

The Court finds that a rational finder of fact viewing the evidence presented at trial in the light most favorable to the prosecution, could have found beyond a reasonable doubt that Petitioner acted with forcible compulsion in sexually assaulting J.S.  The Court therefore concludes that the Appellate Division's rejection of Petitioner's legal insufficiency of the evidence argument was not contrary to, or an unreasonable application of, *Jackson*.

## VII.    Conclusion

Based upon the foregoing, the Court recommends that Petitioner's Petition for a writ of habeas corpus (Dkt. No. 1) be denied and dismissed.

**WHEREFORE**, based upon the foregoing, it is hereby

**RECOMMENDED**, that the Petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED**.  The Court finds that Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) (2006) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).  Therefore, the Court recommends that no certificate of appealability issue with respect to any of Petitioner's claims; and it is hereby

**ORDERED**, that the Clerk's Office provide Petitioner with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: August 5, 2015
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge



Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Samuel SAUNDERS, Petitioner,
v.
Thomas L. LAVALLEY, Superintendent, Respond-
ent.

No. 10–CV–5896 (CS)(LMS).
Signed June 10, 2014.

**ORDER ADOPTING REPORT AND RECOM-
MENDATION**

SEIBEL, District Judge.

*1 Before the Court is the Report and Recom-
mendation of Magistrate Judge Lisa Margaret Smith
dated May 16, 2014 (the "R & R"), in which she
recommends that Petitioner's Petition for a Writ of
Habeas Corpus pursuant to 28 U.S.C. § 2254, (Doc.
1), be denied.

A district court reviewing a magistrate judge's
report and recommendation "may accept, reject, or
modify, in whole or in part, the findings or recom-
mendations made by the magistrate judge." 28 U.S.C.
§ 636(b)(1)(C). Parties may raise objections to the
magistrate judge's report and recommendation, but
they must be "specific," "written," and submitted
"[w]ithin 14 days after being served with a copy of the
recommended disposition." Fed.R.Civ.P. 72(b)(2);
accord 28 U.S.C. § 636(b)(1)(C).

Insofar as a report and recommendation deals
with a dispositive matter, a district court must conduct
a *de novo* review of those portions of the report or
specified proposed findings or recommendations to

which timely objections are made. 28 U.S.C. §
636(b)(1)(C); *see* Fed.R.Civ.P. 72(b)(3) ("The district
judge may accept, reject, or modify the recommended
disposition; receive further evidence; or return the
matter to the magistrate judge with instructions.").
The district court may adopt those portions of a report
and recommendation to which no timely objections
have been made, provided no clear error is apparent
from the face of the record. *See* Lewis v. Zon, 573
F.Supp.2d 804, 811 (S.D.N.Y.2008); Nelson v. Smith,
618 F.Supp. 1186, 1189 (S.D.N.Y.1985);
Fed.R.Civ.P. 72 advisory committee's note (b).

No objections to the R & R have been filed, and
my review of the R & R reveals no error, clear or
otherwise, in its analysis.[FN1] Accordingly, I adopt the
R & R as the decision of the Court. The Petition is
dismissed. The Clerk of Court is respectfully directed
to close the case.

> FN1. The statement on page 4 of the R & R
> that a search of the garbage shed of Peti-
> tioner's apartment complex occurred on June
> 5, 2007, appears to be a typographical error.
> Page 10 describes statements made about that
> search during the course of Petitioner's in-
> terrogation on January 6, 2007, so the search
> must have taken place on January (not June)
> 5, 2007.

SO ORDERED.

***REPORT AND RECOMMENDATION***

LISA MARGARET SMITH, United States Magistrate
Judge.

**TO: THE HONORABLE CATHY SEIBEL,
U.S.D.J.**[FN1]

> FN1. Your Honor referred this application to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

me for preparation of a Report and Recommendation on September 13, 2010. Order of Reference, Docket Entry (herein, "D.E.") 3.

Petitioner Samuel Saunders, proceeding *pro se*, has filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his state court conviction on four counts of murder in the second degree (N.Y. Penal Law §§ 125.25(1) & (3)), one count of kidnapping in the first degree (N.Y. Penal Law § 135.25(3)), one count of robbery in the first degree (N.Y. Penal Law § 160.15(2)), one count of burglary in the first degree (N.Y. Penal Law § 140.30(1)), and one count of criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03(3)). Am. Pet. 1. After a jury trial, Petitioner was sentenced to an indeterminate period of twenty-five years to life for murder in the second degree; an indeterminate period of twenty-five years to life for kidnapping in the first degree; a determinate period of twenty-five years with five years' post-release supervision for robbery in the first degree; and a determinate period of fifteen years with five years' post-release supervision for criminal possession of a weapon in the second degree. The sentences were to run concurrently. S: 34–34.[FN2]

> **FN2.** Herein, "S" refers to the March 26, 2008, sentencing transcript.

**\*2** Petitioner filed a direct appeal to the New York State Appellate Division, Second Department. Resp't's Ex. E. On appeal, Petitioner made three arguments: (1) Petitioner was denied a fair trial by admission of evidence from an alleged prior robbery; (2) Petitioner was denied a fair trial by admission of custodial statements in violation of the Petitioner's *Miranda* rights; [FN3] (3) the jury's verdict was against the weight of the evidence. Resp't's Ex. E. On March 23, 2010, the Supreme Court, Appellate Division, Second Department unanimously affirmed the conviction. *People v. Saunders,* 71 A.D.3d 1058, 898 N.Y.S.2d 168 (N.Y.App.Div.2010); Resp't's Ex. H. Thereafter, Pe-

titioner filed an application for leave to appeal to the New York Court of Appeals, raising the same claims that he had made on direct appeal. Resp't's Ex. I. On June 15, 2010, the Court of Appeals denied Petitioner's application. *People v. Saunders,* 15 N.Y.3d 757, 906 N.Y.S.2d 830, 933 N.E.2d 229 (2010); Resp't's Exhibit L.

> **FN3.** *Miranda v. Arizona,* 384 U.S. 436, 471–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Petitioner filed his Petition for habeas corpus on August 4, 2010. Pet., D.E. 1. He then filed an Amended Petition on April 1, 2011. Am. Pet., D.E, 14.

Herein, Petitioner raises the following grounds for habeas relief:

(1) The admission of evidence of a prior robbery violated Petitioner's Fourteenth Amendment right to a fair trial;

(2) Admission of Petitioner's pre-trial, custodial statements violated Petitioner's *Miranda* rights;

(3) The jury's verdict was against the weight of the evidence. Am. Pet. 2.

For the following reasons, I conclude, and respectfully recommend that Your Honor should conclude, that this Petition should be denied in its entirety.

### *I. BACKGROUND*[FN4]

> **FN4.** Herein, "H" refers to the transcript for pretrial hearings from January 3, 2008 through January 10, 2008. "T1" refers to the transcript for jury trial from January 14, 2008 through January 17, 2008. "T2" refers to the transcript for jury trial from January 18, 2008

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

through February 4, 2008. "PE" refers to a People's exhibit at trial.

## A. The Crime

At approximately 10:55 A.M., on the morning of January 3, 2007, Doctor Leandro Lozada called an 800 number for Bank of America Investment Services. T2; 274, 324–26, 872–73.[FN5] He requested a transfer of $400,000 from his brokerage account to his checking account. T2: 327. Bank of America employee Stephen Griffin told Lozada that only $50,174.49 was available for immediate transfer. PE: 158, Griffin heard a second person (later identified as the Petitioner) ask, "What do you have available today?" T2: 331, 788. Lozada repeated the question to Griffin, who replied that $50,174.49 was available for immediate transfer, PE: 158. Lozada asked Griffin to transfer that amount, and Griffin completed the transaction as requested. *Id.* The transfer brought the total in Lozada's checking account to a few hundred dollars over $57,000. T2: 309.

> FN5. The People introduced a recording and transcript of this call into evidence at trial. T2: 328–39. Herein, "Bank of America call recording" refers to the recording of this call.

Later that day at approximately 1:45 P.M., Petitioner entered a Washington Mutual Bank in Bronx, New York. T2: 370–71. He deposited a check in the amount of $57,000, dated January 3, 2007, made payable to him from Lozada's Bank of America checking account, T2: 296–97, 371–75. Approximately an hour later Lozada's girlfriend, Doctor Carmen Ramos, found Lozada dead in his apartment on Brendan Hill Road in Yonkers. T2: 246–48. He had gunshot wounds in his face and head. T2: 712, 1146–48, 1150–51. Ramos testified that when she arrived at Lozada's apartment the front door to the house was unlocked, although in her experience Lozada usually kept that door locked. T2: 246–47. A yellow chair with blood stains on its edge and back had been moved from the dining room to the bedroom.

T2: 479–80, 995–96.

**\*3** On the night of June 5, 2007, detectives, with the assistance of the crime scene unit, found in the garbage shed of Petitioner's apartment complex, among other items: a blood-stained towel with "Leandro" embroidered on it (T2: 407–08, 433–34, 464, 514); a black glove (T2: 464, 514); a pair of blood-stained sneakers owned by Petitioner (T2: 516–18, 522–53, 574–75, 587); Lozada's blue laundry bag, which contained a blood-stained pillow, a second black glove, and two swatches of cloth-one of which matched a piece of cloth found in Lozada's dresser (T2: 516–18); a bloodied piece of duct tape with a bullet hole (T2: 443–44, 538–42, 545–52); a blood-stained T-shirt and pair of shorts belonging to Lozada (T2: 443–44, 538–40, 554–55, 990–92); and three pillowcases from Lozada's bedroom, one of which had two pieces of duct tape attached to it and another containing two pieces of duct tape (T2: 443–44, 538–40, 554–55, 557). The towel with "Leandro" embroidered on it and the first black glove were found loose in the garbage bin, while the rest of the items were found in two black, plastic, garbage bags. T2: 433–34, 444, 537–41,547–57.

The blood stains on the pair of sneakers matched Lozada's DNA, and the inside of the sneakers contained DNA from which Petitioner and his family could not be excluded. T2: 1000–01, 1071–72. Forensic analysis showed the following: the striation and other characteristics of the two black, plastic, garbage bags matched those of the garbage bags in an opened Ultrasac box found underneath Petitioner's sink (T2: 693, 704–05, 827, 830, 838, 855); the holes in the pillowcase were bullet holes (T2: 951, 954, 957); the blood on the duct tape matched Lozada's DNA (T2: 548; 1009–10); the blood stains on the yellow chair also matched Lozada's DNA (T2: 995–96); and Lozada was likely seated, with the duct tape and a pillowcase secured around his head, when he was shot in the head (T2: 479–80, 542, 954–58, 995–96).[FN6]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
(Cite as: 2014 WL 2624763 (S.D.N.Y.))

FN6. Doctor Kunjala Ta Ashar also testified that the direction of the bullet wounds in Lozada's head was consistent with the finding that Lozada was seated when he was shot in the face and head. T2: 1151–52.

DNA testing showed that wall markings in Lozada's home matched the DNA of Petitioner's co-defendant, Juan Bernardez. T2: 1002, 1014–15. Telephone records revealed that Petitioner had called Bernardez's cell and home telephone numbers several times the night before and the morning of Lozada's murder. T2: 780, 859–62, 1078, 1095–97. Detectives recovered from Bernardez's home a box of .22–caliber cartridges of the same type and classification as bullet fragments retrieved from Lozada's head. T2: 622, 625, 629, 1134–36, 1138.

Petitioner told Detective George Piedade that the $57,000 check from Lozada was payment for a property on Lincoln Avenue in Yonkers that Petitioner was selling to Lozada for $200,000. T2: 749. However, no paperwork regarding the Lincoln Avenue property was found in Lozada's home. T2: 750. Petitioner did not own the Lincoln Avenue property. T2: 749. He could not explain what the term "flipping" the property meant, though he claimed he was "flipping" the Lincoln Avenue property to Lozada. T2: 749, 750. When asked why the check was for $57,000, Petitioner said Lozada had chosen the amount, but Petitioner did not know why Lozada had chosen that amount. T2: 767, 891–92. Lozada's investment advisor testified that, within thirty days prior to Lozada's murder, Lozada had transferred $50,000 from his bank account to his brokerage account, in order to earn a higher interest rate. The advisor also testified that Lozada expressed no intention of using the money any time soon. T2: 310–11. Petitioner also told Detective Piedade and Sergeant William Rinaldi that he had received the $57,000 check around Christmas, and that Lozada had chosen to postdate the check for tax reasons, as well as to allow him to liquidate some assets before the check would be negotiated. T2: 749,

751, 892.

**\*4** Petitioner had previously sold his home in Brendan Hill to Lozada in May of 2006, at a loss of $25,000, because Petitioner and his ex-wife, Edna Saunders, were getting divorced. T2: 226, 349–51, 564–67, 639–40. After that sale Petitioner had asked real estate salesperson Louis Castaldi to find a property for Petitioner to buy. T2: 350. Castaldi found a property for Petitioner, and Petitioner made a $47,000 down payment on the property. T2: 352–53. However, Petitioner lost the $47,000 deposit when he was unable to pay the remainder of the purchase price. T2: 352–53. In July of 2006, Castaldi told Petitioner that a property at 110 Lincoln Avenue in Yonkers, consisting of two lots, one of which was vacant, was for sale at $730,000. T2: 353, 363, 367. Petitioner told Castaldi that he wanted to buy the property, and Petitioner and Castaldi agreed that the vacant lot of the two lots would be listed for resale. T2: 363–64, 366. In October of 2006, Petitioner was required to make a down payment of $73,000 on the Lincoln Avenue property in order for the purchase to go forward. T2: 354–55. Petitioner paid $10,000, and for the next few months he failed to pay any additional money. T2: 354–55, 420, 421. During that time Petitioner reconciled with Edna Saunders, and he told her that they would move into the Lincoln Avenue home in the first week of January 2007. T2: 567, 576–77, 580. Castaldi pressed Petitioner for the rest of the down payment. T2: 355–56, 419–21, 423. The day after Lozada's murder, Petitioner showed Castaldi a receipt from the $57,000 deposit and told Castaldi the amount was for the remainder of Petitioner's deposit on the Lincoln Avenue property. T2: 356–58.

**B. The Davis Robbery**FN7

FN7. At the time of the Petitioner's trial in this case, Petitioner had been indicted on charges of robbery in the first and second degrees for the Davis robbery. Resp't's Mem. 5 n. 4; T1: 316.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
(Cite as: 2014 WL 2624763 (S.D.N.Y.))

At trial, the People introduced Stuart Davis's testimony about a prior robbery, allegedly committed by Petitioner, as proof of identity. T2: 635–53. Davis was an attorney who had represented Petitioner in the purchase and sale of the Brendan Hill home and in the sale of an apartment on Minford Avenue in Bronx, New York. T2: 636–42. Davis testified that six months prior to Lozada's murder, on June 29, 2006, at approximately 1:00 P.M., Petitioner and two other men had entered Davis's office. T2: 641. One of the men had locked the front door and pointed a pistol at Davis. T2: 641–42, 644, 646. Petitioner had then asked Davis how much money he had in his escrow account. T2: 642–43. Davis had responded that he had $40,000. T2: 643. Petitioner had told Davis to write a check to Petitioner for $40,000 and to call the bank and confirm how much was available in the account. T2: 643–45. Davis had called the bank, and the bank had confirmed there was approximately $47,000 available. T2: 645. Petitioner had then told Davis they were going to hold Davis in the office for three days until the check cleared. T2: 647.

Petitioner had brought a chair from the reception area into Davis's office, and had told Davis to sit in the chair. T2: 643–44. One of Petitioner's cohorts had secured Davis's anus with duct tape to the chair's arms and stuffed a rag in Davis's mouth and placed tape across it. T2: 646–47. Petitioner had removed the tape from Davis's mouth after Davis had gestured for Petitioner to remove the tape. T2: 648–49. Davis had told Petitioner that they should go to the bank together to cash the check, and that the bank had previously cashed checks of larger amounts for Davis. T2: 649. Petitioner and his cohorts had then released Davis from the duct tape, Davis had then written a check for $45,000 to Petitioner, and they had all walked out of the office to the bank. T2: 650–51, 656. Petitioner had told Davis that the men would kill him if he did not get the money. T2: 652. Inside the bank Davis had cashed the check, and he had then given the money to Petitioner. T2; 652–54. They had walked outside and

Petitioner had told Davis he would get the money back soon, but that if Davis went to the police Petitioner and his cohorts would kill him. T2: 653, 660. Davis had immediately returned to his office and called the police. T2; 653–54.

**C. The Interrogations**

**\*5** Detective Piedade testified during a pretrial hearing that he first read Petitioner his *Miranda* rights when Detective Piedade, Detective Anthony Chiarella, and Sergeant Rinaldi arrested Petitioner for grand larceny on January 5, 2007, at Petitioner's address at 10 Pennyfield Avenue in Bronx, New York. H: 26–28. The detectives and sergeant had spoken with employees at Washington Mutual Bank about the $57,000 check Petitioner had deposited on January 3, 2007. H: 8–17. Detective Piedade testified that, after reading the *Miranda* warnings to Petitioner, Piedade asked Petitioner if he had any questions, and Petitioner answered no. H: 28. The detectives did not initiate any conversation with Petitioner on the ride to the Yonkers Police Station. H: 30. At the police station, Petitioner was placed in an interview room. H: 31. At around 8:30 P.M., Detectives Chiarella and Piedade entered the room and read *Miranda* rights to Petitioner again, asked Petitioner if he understood the warnings, and handed Petitioner the *Miranda* warnings card. H: 33. Detective Piedade asked Petitioner if he would speak to the detectives about a check that he had deposited on January 3, 2007. H: 33. Petitioner told the detectives at that point that he would talk to them about the check. H: 33, 138. Detective Piedade asked Petitioner to sign the *Miranda* warnings card if he understood what was on the card. H: 33–34. Petitioner said he did not want to sign anything and pushed the card back toward the detective. H; 34, Detective Piedade then wrote "Refused" and the time on the card. H: 34–35. The trial court found that Petitioner had agreed to answer questions about the $57,000 check. H:411. The interrogation lasted about an hour. *Id* .

Prior to this initial interrogation, Petitioner had asked to use the restroom, and he was allowed to do

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

so. H: 31, 42. During the interrogation Detectives did not have their weapons with them in the interview room. H: 37. Petitioner was not restrained in any way. H; 37. Petitioner said that if he had had anything to do with Lozada's death he would not have deposited the check, knowing that Lozada's murder was "high profile" and in the news. H: 40. Detective Piedade told Petitioner that Petitioner could not have known that Lozada had been murdered when Petitioner deposited the check, because the check was deposited before Lozada's body was found. H: 40–41. Petitioner then said he did not want to talk anymore. *Id.* Petitioner remained unhandcuffed and the door was left ajar when Detectives Piedade and Chiarella left the room. H: 41–42.

Shortly thereafter, Detective James Konka again escorted Petitioner to the bathroom, upon Petitioner's request. H: 42–43. Petitioner told Detective Konka that he was a diabetic and had not taken his medication. H: 42–43, 179. Petitioner did not appear to be sick, confused, or in pain. H: 43. After Petitioner returned to the interview room, Sergeant Rinaldi conducted a second interview and asked Petitioner questions about the reason that Lozada had written the check in the amount of $57,000 and about Petitioner's claim about selling the property to Lozada. H: 232. Petitioner responded that Lozada had postdated the check to first liquidate some assets and that Petitioner was flipping the Lincoln Avenue property to Lozada. H: 233. At approximately 10:50 P.M., police officers took Petitioner to Saint Joseph's Hospital for the hospital to assess whether Petitioner needed medication. H: 42–43, 45, 163, 225. No law enforcement officers questioned Petitioner while he was taken to the hospital or while Petitioner was at the hospital. H: 43–45. Petitioner stayed at the hospital overnight. H: 45–46, 225. No officers questioned Petitioner on his way back to the police station the following morning. H: 46.

**\*6** Back in the interview room on the morning of January 6, 2007, at approximately 5:30 A.M., Detective Piedade and Sergeant Rinaldi conducted a third interview of Petitioner. *Id.* The officers told Petitioner that they had located articles in the garbage shed outside Petitioner's residence and asked Petitioner if he wished to speak with them about what was found. *Id.* Petitioner said yes. *Id.* Detective Piedade again read Petitioner his Miranda rights and Petitioner said, "I know my rights." H: 49. Petitioner still refused to sign the *Miranda* warnings card. H: 49. However, Petitioner said he would speak with the detectives, and Petitioner asked the detectives what they found in the garbage. H: 50, 52. Detective Piedade responded that a bloodstained, green towel with "Leandro" on it was found. H: 52. Petitioner said he had never seen a towel like that. *Id.* The detectives provided coffee and food for Petitioner. H: 46–47, 52. The detectives spoke with Petitioner regarding the $57,000 check. H: 52–53. During the interview Petitioner was not handcuffed. H: 48, 176. The detectives' weapons were not in view. H: 49. The detectives made no threats or promises to Petitioner. H: 59. No one else was in the room. H: 61. The interview ended at approximately 6:30 A.M., and Petitioner remained in the room. H: 60–61. Detective Piedade returned to the interview room at approximately 10:00 A.M. to ask Petitioner more questions after a search of Petitioner's house was executed. H: 54. Detective Piedade asked Petitioner whether he had black garbage bags in his home, and Petitioner said no. H: 62. Detective Piedade asked Petitioner whether the bloody sneakers found in the garbage belonged to Petitioner, and Petitioner said no. H: 62. The interview lasted approximately fifteen minutes. H: 64, 178. After the interview, Petitioner was taken to central booking. H: 64.

## II. DISCUSSION

### A. Standard of Review

"Habeas review is an extraordinary remedy." *Bousley v. United States,* 523 U.S. 614, 621, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (citing *Reed v. Farley,* 512 U.S. 339, 354, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994)). To be granted a writ of habeas corpus from a federal district court, a petitioner must fully and carefully comply with the provisions of the Antiter-

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

rorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Under the AEDPA, all state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus. 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). In the interests of comity and expeditious federal review, " '[s]tates should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *See Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Daye v. Att'y Gen. of New York,* 696 F.2d 186, 190–91 (2d Cir.1982). The exhaustion requirement of the federal habeas corpus statute is set forth in 28 U.S.C. § 2254(b), (c):

**\*7** (b) (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that-

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B) (I) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the

rights of the applicant.

...

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he [or she] has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b), (c).

The Second Circuit has adopted a two-stage inquiry to determine whether the exhaustion doctrine

has been satisfied. *See Klein v. Harris,* 667 F.2d 274, 282 (2d Cir.1981). First, the petitioner must have "fairly presented" his or her federal constitutional claim to the appropriate state courts. *Picard,* 404 U.S. at 275–76. "A claim has been 'fairly presented' if the state courts are apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court." ' *Jones v. Vacco,* 126 F.3d 408, 413 (2d Cir.1997) (quoting *Daye,* 696 F.2d at 191). In other words, the claim must have been presented in a way that is "likely to alert the court to [its] federal nature." *Daye,* 696 F.2d at 192. The fair presentation requirement is satisfied if the state court brief contains phrases, such as "under the due process clause" or "under the Constitution," that point to the petitioner's reliance on the United States Constitution as his or her legal basis for relief. *Klein,* 667 F.2d at 282 (citations omitted). A claim may be considered "presented" even if the federal grounds were not explicitly asserted before the state courts if the petitioner, in asserting his or her claim before the state court, did one of the following: "(a) reli[ed] on pertinent federal cases employing constitutional analysis, (b) reli[ed] on state cases employing constitutional analysis in like fact situations, (c) assert[ed] ... the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) allege] ... a pattern of facts that is well within the mainstream of constitutional litigation." *See Daye,* 696 F.2d at 194.

Second, having fairly presented his or her federal constitutional claim to the appropriate state court and having been denied relief, the petitioner must appeal his or her conviction to the highest state court. *Klein,* 667 F.2d at 282. Where a petitioner fails to present his or her federal constitutional claim to the highest state court, the claim cannot be considered exhausted. *Id.* (citing *Williams v. Greco,* 442 F.Supp. 831, 833 (S.D.N.Y.1977)). There is, however, another avenue available for exhaustion purposes. A petitioner who has failed to exhaust state remedies by pursuing a direct appeal may satisfy the exhaustion requirement by utilizing available state methods for collaterally

attacking his or her state conviction. *See Klein,* 667 F.2d at 282 (citing *Johnson v. Metz,* 609 F.2d 1052, 1055–56 (2d Cir.1979)). If collateral relief is denied, the petitioner may satisfy the exhaustion requirement by employing the state appellate procedures available for review of such denial. *Id.* at 283.

**\*8** Generally, a state prisoner has one year from the date his or her conviction becomes final to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expira-tion of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The limitations period is tolled while "... a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending...." 28 U.S.C. § 2244(d)(2). After a petitioner has met these threshold requirements, a federal district court gener-ally may hear "an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court" only if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

**B. Petitioner's Claims for Habeas Relief**

**1. Admission of Davis's Testimony Regarding the Davis Robbery**

Petitioner claims that he was deprived of a fair trial when the trial court erroneously admitted Davis's testimony regarding Petitioner's alleged prior robbery of Davis. Petitioner claims the prosecution used the Davis robbery to "impart facts and inflame the jury." Am. Pet. 5. Petitioner argues that evidence from the Davis robbery "imprinted facts" on the Lozada case.[FN8] *Id.* Petitioner argues that unlike the Davis robbery, there was no evidence of Lozada's arms being bound to a chair or forensic blood spatter analysis indicating that Lozada was in the chair at the time of

the murder. *Id.* Petitioner claims that the trial court failed to acknowledge the prejudicial effect of the "heinous prior robbery testimony" before finding the evidence admissible. *Id.*

> FN8. Petitioner also argues that, in the Lozada murder case, Edna Saunders was unable to identify Petitioner's voice in the Bank of America call recording, and she was a cooperating witness for the prosecution. Am. Pet. 5. It is unclear how this argument supports Petitioner's contention that evidence of the Davis robbery "imprinted facts" on the Lozada murder case. Additionally, Petitioner did not include this argument to support this claim on direct appeal.

Prior to admitting Davis's testimony, the trial court set out the standard for admitting evidence of uncharged crimes: Evidence of uncharged crimes is generally not admissible against a defendant to prove a specific crime; however, an "identity" exception ex-ists in limited circumstances when there is clear and convincing evidence that the defendant used a dis-tinctive modus operandi in an uncharged or charged crime as to make the evidence highly probative of the defendant's identity in the crime at issue in trial. T1: 314–15. The state trial court found that the probative value of the evidence concerning the Davis robbery outweighed any potential prejudice to the Defendant. T1: 315–16. The trial court then noted that identity was an issue at trial and the Davis robbery was highly probative of that issue. T1: 316. The trial court de-termined that the robberies were conducted with sim-ilarities:

> Both occurred during the daytime. Both involved victims who had prior business dealings with the Defendant. Both were perpetrated with the assis-tance of other individuals. Both involved small caliber handguns. In both instances, the victim ap-peared to be sitting in a chair. In both instances, the victim had been gagged and restrained. In both in-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

stances, it involved a victim being asked the amount of money available in a bank account. Both instances involved a victim writing out a check payable to the Defendant. In both instances, a call was made to a bank to confirm available funds. In both cases, a check had been written for an even amount that was slightly less than the funds available in the account, and in both instances, it involved the Defendant giving an innocent explanation to police regarding his actions.

**\*9** T1: 314–18. Based on these similarities, the trial court granted the People's application to introduce evidence of the Davis robbery, subject to limiting instructions, to establish Petitioner's identity. T1:318.

On direct appeal to the Appellate Division, Petitioner argued that the introduction of the Davis testimony at trial had the effect of convicting the Defendant on "imprinted facts" not properly before the jury. Resp't's Ex. E. 43. Petitioner argued that the evidence of the prior robbery was "so volatile and inflammatory when amplified by the charges in this case" that any reasonable juror might convict the Defendant solely "on the basis of preventing one more similar heinous act." Resp't's Ex. E. 44. The Appellate Division disagreed, concluding that the trial court "correctly permitted the introduction of testimony by the victim of a robbery committed approximately six months before the murder of the victim in this case as evidence of the identity of the perpetrator of the instant crime." *Saunders,* 71 A.D.3d at 1058–59, 898 N.Y.S.2d 168; Resp't's Ex. H. Petitioner included this claim in his letter application seeking leave to appeal to the Court of Appeals, which was denied by that Court. *Saunders,* 15 N.Y.3d 757, 906 N.Y.S.2d 830, 933 N.E.2d 229; Resp't's Ex. L. Thereafter, Petitioner filed a timely petition for habeas corpus. *See* 28 U.S.C. § 2244(d)(1)(A).

**i. The Legal Standard**

Petitioner's claim challenges the state court's application of state evidentiary law. Generally, state

court evidentiary rulings, even if erroneous, do not present the kind of federal constitutional claims for which habeas relief may be granted. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). In order for a state court's evidentiary ruling to present a federal constitutional claim, the ruling must have deprived the petitioner of his or her right to a fundamentally fair trial. *Collins v. Scully,* 755 F.2d 16, 18 (2d Cir.1985). A state court's erroneous admission of evidence results in a deprivation of this right if the evidence in question, "viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Id.* at 19.

**ii. Application of Law to Instant Case**

Petitioner's claim does not rise to the level of a federal constitutional claim. First, it does not appear that the state court's admission of this evidence was erroneous as a matter of state law, for the reasons stated by the Appellate Division:

> The testimony constituted clear and convincing evidence that the defendant committed the prior robbery by using a sufficiently distinctive and unique modus operandi similar to the manner in which the crime was committed in this case, which was probative of the defendant's identity as one of the perpetrators of the murder of the victim in this case (*see People v. Mateo,* 93 N.Y.2d 327, 322 [1999]; *People v. Robinson,* 68 N.Y.2d 541, 549–50 [1986]; *People v. Alvino,* 71 N.Y.2d 233, 242 [1987]; *People v. Molineux,* 168 N.Y. 264, 293 [1901]; *People v. Smith,* 63 A.D.3d 1301, 1303 [2009]; *People v. Gousse,* 57 A.D.3d 800 [2008]; *People v. Latimer,* 24 A.D.3d 807, 809 [2005]; *People v. Manino,* 306 A.D.2d 542 [2003]; *People v. Rodriguez,* 274 A.D.2d 593, 594[2000] ).

**\*10** *Saunders,* 71 A.D.3d at 1059, 898 N.Y.S.2d

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

168; Resp't's Ex. H. The trial court also weighed the probative value of this evidence in identifying the perpetrators of Lozada's murder against any prejudice Petitioner might suffer from this evidence when determining that the evidence was admissible. T1: 315–16.

Second, even if the trial court's decision to admit Davis's testimony was a misapplication of state evidentiary law (which it was not), the trial court's ruling would still not rise to the level of depriving Petitioner of his right to a fair trial. Viewed in the context of the entire record, the testimony was not "crucial, critical, highly significant" to the outcome of Petitioner's case. *Collins,* 755 F.2d at 19 (quotation and citation omitted).

Evidence at trial showed that items from the Lozada crime scene were found in a garbage bin outside of Petitioner's home. Officer Suzanne Crane found in the garbage bin Lozada's personal items, a pair of Petitioner's sneakers stained with Lozada's blood, and pieces of duct tape and a pillowcase apparently used to restrain Lozada's head when he was shot. T2: 270, 276–77, 283–86, 443–34, 444, 514–20, 540–41, 545, 554–57, 951, 954, 957, 1009–10. Forensic analysis determined that the holes in the pillowcase and duct tape were bullet holes. T2: 444, 951, 954, 957. The blood on the duct tape was Lozada's blood. T2: 548, 1009–10. Forensic analyst Ted Schwartz testified that the two black, plastic, trash bags could have come from the opened box of Ultrasac garbage bags found in Petitioner's residence at 10 Pennyfield Avenue. T2: 838. The measurements, characteristics, and striation lines of the two trash bags matched and directly lined up with the bags in the Ultrasac box. T2: 823–829, 838. Petitioner argued that it was reasonable to believe that Bernardez had deposited the black garbage bags containing Lozada's personal items and the bloody sneakers in the garbage shed, rather than Petitioner. T2: 1209. However, such an argument did not undermine the evidentiary value of the various relevant items seized outside Petition-

er's home.

Moreover, among the seized items were bloody sneakers belonging to Petitioner. Edna Saunders identified the pair of sneakers stained with Leandro Lozada's blood as sneakers which she had given to Petitioner. T2: 574–76. Forensic science specialist Mary Eustace testified at trial that the DNA of the blood stains on the sneakers matched Lozada's DNA. T2: 999–1000. DNA tests done on the bloody sneakers excluded Petitioner from the front portion inside both sneakers, and the tests could not determine the age of the DNA inside the shoes. T2: 1069–70. However, tests done on the heel portions inside the sneakers could not exclude Petitioner and his family, though Lozada, Ramos, and Bernardez were excluded. T2: 1001, 1071–72. Thus, in addition to evidence apparently removed from the murder scene and hidden outside Petitioner's home, there was direct evidence-Petitioner's bloody sneakers-linking Petitioner to the rest of the murder evidence.

**\*11** Petitioner's story about having the $57,000 check was unsubstantiated and contradicted by the evidence. Petitioner was in possession of and deposited a $57,000 check signed by Lozada and dated the same date as Lozada's murder. T2: 296–97, 371–75. No evidence was found to substantiate Petitioner's claim that Lozada planned to purchase the Lincoln Avenue vacant lot from Petitioner. T2: 749–50. Furthermore, Petitioner claimed to be selling property he did not own. T2: 749. Petitioner also could not explain what "flipping" the property meant after telling the detectives that he was "flipping" the property to Lozada. Ramos, Lozada's financial advisor, Castaldi, and Edna Saunders all testified at trial that they had no knowledge of the alleged sale. T2: 228–29, 306, 310–11, 360, 362–64, 368, 423, 583. By contrast with Petitioner's story told to the Detectives, Lozada's financial advisor testified that Lozada had, within the thirty days prior to his murder, transferred $50,000 from his bank account to his brokerage account for a higher interest rate. T2: 310–11. The advisor also

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

testified that Lozada had had no intention of using the money any time soon. *Id.* Castaldi testified that Petitioner promised Castaldi the right to list the vacant lot for resale without indicating that Petitioner had found a buyer. T2: 363–64. Petitioner told Castaldi the day after Lozada's murder that the $57,000 Petitioner deposited into his account was for his own purchase of the Lincoln Avenue property.

Petitioner also claimed that the check was written for $57,000 because Lozada had decided on that amount. T2: 767, 891–92. However, Petitioner could not explain why Lozada had selected that particular number. T2: 891–92. The Bank of America call recording shows there was slightly over $57,000 in Lozada's account-just enough to cover the amount of the check-on the day Petitioner deposited the check, only because Lozada had transferred the maximum $50,179.49 allowed that day. T2: 326; PE: 158. Griffin testified that during Lozada's call to Bank of America, Griffin heard a second voice asking how much money was available for immediate transfer to Lozada's checking account. T2: 331. Detective Piedade testified that the second voice in Lozada's call to Bank of America sounded like Petitioner's voice. T2; 788.

DNA testing of wall markings in Lozada's home matched the DNA of Bernardez, and Petitioner had been calling Bernardez's home telephone and mobile phone numbers the night before and the morning of Lozada's murder. T2: 780–81, 859–62, 1078, 1095–97. The bullet fragments retrieved from Lozada's head were .22 caliber, hollow point, and copper coated, and had on them the same manufacturing marks and substance as .22–caliber shell casings found in Lozada's home. T: 1333–34, 1157–58. Detectives recovered from Bernardez's home a box of .22–caliber cartridges of the same type and classification as the bullet fragments retrieved from Lozada's head. T2: 622, 625, 629, 1134–36, 1138. All of this evidence, even without the evidence of the Davis robbery, was more than sufficient to establish Peti-

tioner's participation in the murder of Lozada.

**\*12** At trial, the People also offered evidence of Petitioner's motive to commit the crimes for which he was convicted. Petitioner had already lost $47,000 in a prior property that he had sought to purchase. T2: 352–53. Petitioner was facing the possibility of losing another $10,000 if he failed to pay the rest of his down payment for the Lincoln Avenue property. T2: 360. Petitioner had also promised Edna Saunders that they were going to move to the Lincoln Avenue property in the first week of January. T2: 567, 576–77, 580. The evidence of Petitioner's motive provided even greater proof of Petitioner's guilt.

In light of this evidence, while the Davis robbery statements offered at trial helped prove the issue of identity, they were not "sufficiently material to provide the basis for conviction." Thus, I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

### 2. Violation of the Right to Silence

Petitioner contests the voluntariness of the statements that he made after he was given *Miranda* warnings. Am. Pet. 7. Petitioner claims that the detectives questioned Petitioner "continuously" until Petitioner was taken to the hospital for his diabetic condition. *Id.* Upon Petitioner's release from the hospital, the detectives continued to elicit involuntary statements from Petitioner. *Id.*

The trial court denied Petitioner's motion to suppress statements made to the detectives while Petitioner was in custody. H: 421–22. The trial court determined that Petitioner knowingly, voluntarily, and intelligently waived his *Miranda* rights. H: 420–21. The trial court based its ruling on its finding that Petitioner was advised of his *Miranda* rights for the first time upon his arrest for grand larceny. H: 418. Within an hour of Petitioner's arrest, Petitioner was advised for a second time of his *Miranda* rights, when he

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

arrived at the Yonkers Police Department. H: 418–19. Petitioner then made certain admissions regarding financial transactions with Lozada. H: 419. The detectives stopped questioning Petitioner when Petitioner said he did not want to speak any more. *Id.* The trial court found that Petitioner did not invoke any of his *Miranda* rights and that Petitioner only indicated a desire to stop talking, which the detectives honored. *Id.* Petitioner was then taken to the hospital, and upon his return the detectives again advised Petitioner of his Miranda rights and asked if Petitioner would speak to them. *Id.* Petitioner acknowledged his rights and agreed to speak. *Id.* Defendant made certain statements about items of evidence found in the trash near his home. H: 420. Petitioner did not then communicate the desire to cease being questioned. H: 419–20. The trial court found there was no evidence that Petitioner had been threatened in any manner or subjected to any undue pressure or police misconduct. H: 420. Having found that the People met their burden of establishing beyond a reasonable doubt that Petitioner's statements were voluntarily and knowingly made, the trial court denied Petitioner's motion to suppress the statements made to the detectives. H: 421–22.

**\*13** On appeal, Petitioner argued that he was denied a fair trial by admission of statements that Petitioner made involuntarily. Resp't's Ex. E. 49. Petitioner argued that the detectives designed the interrogation to evoke a confession from Petitioner. *Id.* Petitioner also claimed that it was in an "atmosphere of pressure and duress" that Petitioner agreed to talk about the $57,000 check with the detectives. *Id.* Petitioner argued that his refusal to sign the waiver card constituted an invocation of his right to remain silent. *Id.* at 50. Petitioner argued that a fresh set of *Miranda* warnings given to Petitioner after his return from the hospital had "no meaning" and that there was a "single continuous interrogation." *Id.* at 51. The People conceded that Petitioner was questioned by Sergeant Rinaldi without new *Miranda* warnings before going to the hospital but that it was harmless error to admit Petitioner's statements made during that time to

Rinaldi. Resp't's Ex. F. 49–50, 55. The Appellate Division affirmed the trial court's ruling and agreed with the People's argument that failure to deny the suppression of Petitioner's statements to Rinaldi was harmless error:

> The erroneous admission of the defendant's statement to the Detective Sergeant was harmless, as the proof of the defendant's guilt, without reference to the error, was overwhelming, there was no significant probability that the jury would have acquitted the defendant had it not been for the admission of the statement, and a portion of the statement was cumulative to the other statements the defendants made to detectives.

*Saunders,* 71 A.D.3d at 1060, 898 N.Y.S.2d 168; Resp't's Ex. H. 2. Petitioner included this claim in his application for leave to appeal the Appellate Division's decision. Resp't's Ex. I. The application was denied. *Saunders,* 15 N.Y.3d 757, 906 N.Y.S.2d 830, 933 N.E.2d 229 (2010); Resp't's Exhibit L. Having "fairly presented" this claim in state court, Petitioner has exhausted this claim. *See Daye,* 696 F.2d at 192, 194; *Klein,* 667 F.2d at 282.

**i. The Legal Standard**

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In other words, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (footnotes omitted). "[A]ll criminal defendants must be apprised of certain rights before a custodial interrogation may begin, including ... the right to remain silent and be afforded the assistance of counsel." *United States v. Plugh,* 648 F.3d 118, 125 (2d Cir.2011), *cert. denied,* —— U.S.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

——, 132 S.Ct. 1610, 182 L.Ed.2d 222 (2012). The defendant can make two legally distinct choices: "(1) unambiguously invoke those rights and thereby cut off further questioning or (2) knowingly and voluntarily waive those rights and cooperate fully." *Id.*

**\*14** An invocation of the right to remain silent must be unambiguous. *Berghuis v. Thompkins,* 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010); *Plugh,* 648 F.3d at 124. The refusal to sign a waiver card does not necessarily constitute an invocation of the right to remain silent, particularly when the refusal is accompanied by statements indicating ambivalence or uncertainty. *Plugh,* 648 F.3d at 125. "Once an accused in custody unequivocally invokes the right to remain silent, interrogation must ordinarily cease." *Campaneria v. Reid,* 891 F.2d 1014, 1021 (2d Cir.1989). *cert. denied,* 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991). This rule is not a per se prohibition against all further interrogation. *Id.* (citing *Michigan v. Mosley,* 423 U.S. 96, 104–07, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)). "Questioning can be resumed after fresh *Miranda* warnings are given and the right to remain silent is otherwise scrupulously honored." *Id.* Whether a defendant's invocation of the right to silence was "scrupulously honored" depends on factors such as the length of time between questioning and questioning on a different subject matter than the original interrogation. *Id.* These factors are not exhaustive or dispositive. *See Wilson v. Henderson,* 584 F.2d 1185, 1188 (2d. Cir.1978) ("We are not of the belief, however, that the crucial factor in determining a Fifth Amendment violation should be the length of time between questioning."); *Brown v. Caspari,* 186 F.3d 1011, 1015 (8th Cir.1999) ("[A] second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview."); [FN9] *United States v. Suarez,* 2006 WL 3543616, at *6 (S.D.N.Y. Dec.7, 2006) ("The factors set out by the Court in *Mosley* are not a strict test for admissibility."); *United States v. Dell'Aria,* 811 F.Supp. 837, 843 (E.D.N.Y.1993) ("[T]he *Mosley* Court did not intend these factors to be exhaustive.... [T]he central focus of the determination is the conduct of law enforcement authorities.").

[FN9]. The Second Circuit has not ruled on whether a second interrogation is rendered unconstitutional merely because it involved the same subject matter as the first interrogation. However, other circuits have held that questioning on the same subject matter is not by itself unconstitutional. *See United States v. Wyatt,* 179 F.3d 532, 538 (7th Cir.1999) ("[T]he constitutionality of a subsequent police interview depends not on its subject matter, but rather on whether the police ... sought to undermine the suspect's resolve to remain silent."); *Weeks v. Angelone,* 176 F.3d 249, 267–69 (4th Cir.1999) ("[T]he mere fact that a second interrogation involves the same crime as the first interrogation does not necessarily render a confession derived from the second interrogation constitutionally invalid under *Mosley.*").

The defendant may also waive his or her *Miranda* rights, provided the waiver is made "voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444. The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The prosecution does not need to show that a waiver of *Miranda* rights was express. *Berghuis,* 560 U.S. at 384. A written waiver is not required. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (T979). *United States v. Boston,* 508 F.2d 1171, 1175 (2d Cir.1974); *United States v. Santiago,* 174 F.Supp.2d 16, 25 (S.D.N.Y.2001) (collecting cases). An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

dence." *Berghuis,* 560 U.S. at 384. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.*

**\*15** "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." *Moran,* 475 U.S. at 421 (citations omitted). The Second Circuit has summarized three sets of circumstances a court should consider in applying the totality of the circumstances test: "(1) the characteristics of the accused; (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green v. Scully,* 850 F.2d 894, 901–02 (2d Cir.1988). The relevant characteristics of the accused are the individual's experience and background, along with the individual's youth and lack of education or intelligence. *Id.* at 902. The conditions under which a suspect is questioned include the place where an interrogation is held and the length of detention. *Id.* Facts bearing on law enforcement officers' conduct include: "the repeated and prolonged nature of the questioning or the failure to inform the accused of his constitutional rights; whether there was physical mistreatment such as beatings ... or long restraint in handcuffs[;] and whether other physical deprivations occurred such as depriving an accused of food, water or sleep...." *Id.* (citations omitted).

"[T]he ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Thus, federal courts are "not bound by" a state court's finding regarding the voluntariness of a confession and are required to "make an independent evaluation of the record." *Id.* at 110 (quoting *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). This requirement for independent review specifically extends to federal courts considering petitions for writs of habeas corpus. *Id.* at 111 (citing *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966)). However, a state court's determinations of "subsidiary factual questions," such as "whether a drug has the properties of a truth serum or whether in fact the police engaged in the intimidation tactics alleged by the defendant," are entitled to the presumption of correctness provided by AEDPA. *Id.* at 112; *see also Green,* 850 F.2d at 900 ("The statutory [AEDPA] presumption refers to historical facts, that is, recitals of external events and the credibility of the witnesses narrating them.").

**ii. Application of Law to Instant Case**

In Petitioner's case, the issue of the voluntariness of both Petitioner's waiver of his *Miranda* rights and his subsequent statements to the police was fully developed during the *Huntley* hearing. *See* H: 5–431. The totality of the circumstances as established by the record supports the conclusion that Petitioner made his statements to the detectives after he voluntarily, knowingly, and intelligently waived his *Miranda* rights.

**\*16** Petitioner argues that he first invoked his right to silence by refusing to sign the card when given *Miranda* warnings at the Yonkers Police Station on January 5, 2007. However, the refusal to sign a waiver card does not necessarily constitute an "unambiguous" invocation of the right to silence. *See Plugh,* 648 F.3d at 125. Contrary to clearly indicating the desire to cease questioning, Petitioner voluntarily made statements about the $57,000 check to the detectives after acknowledging he understood his *Miranda* rights. H: 33, 37–40. In doing so, Petitioner waived his right to silence. *See Berghuis,* 560 U.S. at 384. The detectives were not required to obtain a written waiver from Petitioner to demonstrate that the waiver was voluntary. *See Butler,* 441 U.S. at 373; *Boston,* 508 F.2d at 1175; *Santiago,* 174 F.Supp.2d at 25.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

Petitioner also argues that the statements were coerced because he was questioned continuously after he refused to sign the waiver card. Am. Pet. 7. An application of the *Green* factors in this instant case shows that Petitioner's statements were made voluntarily. First, Petitioner is legally an adult and there was no evidence in the record indicating that Petitioner lacked intelligence to understand the *Miranda* rights read to him. See *Diaz v. Senkowski,* 76 F.3d 61, 65 (2d Cir.1996) (finding knowing and voluntary waiver where petitioner was legally an adult and there was no evidence that petitioner had below-average intelligence). In fact, Petitioner knew to invoke his right to silence later in the interrogation when Detective Piedade pointed out that Petitioner could not have known about Lozada's death at the time Petitioner deposited the check. H: 40–41. Though Petitioner is a diabetic, he did not appear to be sick or in pain. H: 43. Petitioner's medical records from Saint Joseph's Hospital showed that Petitioner slept for a significant portion of the time that he was at the hospital and the medical staff determined his physical condition did not require his admission to the hospital. H: 418. Thus, the fact that Petitioner was a diabetic and was sent to the hospital did not render the detectives' questioning of the Petitioner at the police station coercive, especially when Petitioner did not appear to be in discomfort. *Compare Campaneria,* 891 F.2d at 1020 (finding that law enforcement officers' questioning of defendant at the hospital when defendant was awake and alert despite being in pain was not coercive), *with Mincey,* 437 U.S. at 396, 398–99 (finding that defendant's statements were coerced where defendant was interrogated while he was in great pain in the intensive care unit and "encumbered by tubes, needles, and breathing apparatus").

Second, the conditions of the interrogation did not create a coercive atmosphere. Petitioner was placed in a standard interview room and was questioned for approximately an hour. H: 31–33, 41. Courts have found that similar interrogation conditions were not coercive. *See, e.g., Berghuis,* 560 U.S. at 387–88 (finding that an interrogation in a standard-sized room and lasting three hours was not coercive); *Green,* 850 F.2d at 902 (finding that an interrogation in a hearing room lasting just over two hours was not coercive); *United States v. DiLorenzo,* 1995 WL 366377, at *3–4 (S.D.N.Y. June 19, 1995) (finding that an interrogation in an office of average size and lasting two and a half hours was not coercive).

**\*17** Third, there was no evidence of officer misconduct. There was no evidence that the detectives physically threatened or beat the Petitioner. Further, the detectives did not have their weapons with them in the interview room. H: 37–38. Petitioner was not restrained with handcuffs and was allowed to use the restroom when requested. H: 31, 37, 42. The detectives ceased questioning when Petitioner said he did not want to talk anymore. H: 40. The door was left ajar when Detectives Piedade and Chiarella left the room. H: 42. The detectives' conduct supports the state trial court's finding that Petitioner's statements were voluntary. *Compare Berghuis,* 560 U.S. at 386–87 (finding no coercion where defendant was not threatened or injured by police); *Plugh,* 648 F.3d at 128 (finding voluntary waiver where there was no evidence that defendant was threatened physically or psychologically abused in any manner); *Diaz,* 76 F.3d at 65 (finding voluntary waiver where defendant was not beaten, abused, handcuffed, or denied food, access to the bathroom, or sleep during his interrogation), *with Mincey,* 437 U.S. at 396, 398–99 (finding involuntary waiver where police questioned petitioner "relentlessly" while petitioner was seriously wounded, on the "edge of consciousness" in the intensive care unit, and had expressed his wish not to be interrogated); *Greenwald v. Wisconsin,* 390 U.S. 519, 520–21, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (finding involuntary confession where petitioner was deprived of food, sleep, and medication, denied counsel, and received inadequate warnings about constitutional rights); *United States v. Guzman,* 724 F.Supp.2d 434, 446–47 (S.D.N.Y.2010) (finding involuntary confes-

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

sion where officer did not observe defendant's invocation of right to silence).

Statements that Petitioner made to Sergeant Rinaldi during the second interrogation of Petitioner should have been suppressed. "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored .' " *Mosley,* 423 U.S. at 104. Here, Rinaldi began asking Petitioner questions about the same subject matter soon after Petitioner indicated he no longer wanted to speak to the detectives about the $57,000 check. H: 41–42, 230.[FN10] Rinaldi also did not re-advise Petitioner of his *Miranda* rights prior to beginning the interrogation. H: 237, 239–40. The short length of time between the first and second interrogations and the questioning on the same subject matter supports a finding that Rinaldi failed to scrupulously honor the Petitioner's right to cut off questioning. *See Campaneria,* 891 F.2d at 1021 (noting length of time between questioning and similarity between subject matter of the interrogations as factors that are indicative of whether the right to cut off questioning was scrupulously honored); *Guzman,* 724 F.Supp.2d at 446–47.

> FN10. Rinaldi was not aware that Petitioner had stated earlier he no longer wished to speak with the detectives. T2: 906.

**\*18** Petitioner did, however, voluntarily waive his right to silence during the third interview when he returned from the hospital and made uncoerced statements. When Petitioner was brought back to the interview room from the hospital, Detective Piedade re-advised Petitioner of his *Miranda* rights. H: 49. Petitioner argued on appeal to the Appellate Division that "[u]nder these circumstances" a "fresh set of *Miranda* warnings have no meaning." Resp't's Ex. E. 51. However, the record indicates that Petitioner replied to Detective Piedade, "I know my rights." H: 49. There is no evidence in the record that Petitioner was

ill or incapable of understanding his rights, and this was the third time Petitioner had been advised of his *Miranda* rights. The fact that Petitioner still refused to sign the card is of no moment, especially when Petitioner said without being coerced that he wished to speak with the officers. H: 50. *See United States v. Boston,* 508 F.2d 1171, 1175 (1974); *see also Suarez,* 2006 WL 3543616, at *6 (finding that defendant's rights were not violated where defendant made an inculpatory statement upon being presented with the results of a search of his car despite initially determining not to speak with the officers). In *Boston,* the defendant refused to sign a waiver of his *Miranda* rights. *Boston,* 508 F.2d at 1175. However, when officers subsequently relayed to the defendant information about evidence found in his apartment, the defendant admitted his participation in the robbery. *Id.* The Second Circuit found that the defendant had made a voluntary waiver of his right to remain silent. *Id.* Here, Petitioner engaged the detectives in conversation, asking the detectives what they had found in the garbage shed, upon being confronted with the news that law enforcement officers found items in the garbage bin outside Petitioner's home. H: 50, 52. By making uncoerced statements to the detectives after acknowledging his *Miranda* rights, Petitioner knowingly and voluntarily waived his right to silence. *See Boston,* 508 F.2d at 1175; *Suarez,* 2006 WL 3543616, at *6.

Just as was the case in the first interrogation, there was no evidence of police misconduct during the third interrogation. Petitioner was not handcuffed during the interview. H: 48, 176. There were no weapons in view. H: 49. No one made threats or promises to Petitioner. H; 59, Petitioner received coffee and food when requested. H: 47, 52. Petitioner remained unhandcuffed after Detective Piedade left the room. H: 61. The interrogation lasted for approximately an hour, with a three-hour break, and then resumed for approximately fifteen minutes. H: 58,64, 178.

Furthermore, the detectives did not violate Peti-

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

tioner's right to silence by resuming interrogation upon Petitioner's return from the hospital. Petitioner was re-advised of his *Miranda* rights. Approximately six and one-half hours had passed from the time the detectives had ceased questioning Petitioner the day before. H: 45–46, 225. The detectives began the discussion on a different subject matter, involving the evidence found in the garbage bin outside Petitioner's apartment. H: 50. These factors support a finding that Petitioner's invocation of his right to silence the day before had been "scrupulously honored." *See Campaneria,* 891 F.2d at 1021. Even if the subject matter reverted back to the issue of the $57,000 check, questioning on the same subject matter does not necessarily render a second interrogation unlawful. *See Caspar,* 186 F.3d at1015; *Wyatt,* 179 F.3d at 538; *Weeks,* 176 F.3d at 267–69. There is no indication in the record that the conduct of the detectives was coercive or that Petitioner did not wish to speak to the detectives.

**\*19** Although Petitioner's statements from the second interrogation were admitted in error at trial, it was harmless error. In assessing whether to overturn a state conviction, the federal court must apply the *Brecht* [FN11] standard and assess whether the constitutional violation had a "substantial and injurious effect" in determining the jury's verdict. *Wood v. Ercole,* 644 F.3d 83, 93–94 (2d Cir.2011) (citing *Frye v. Pliler,* 551 U.S. 112, 121–22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007)). Here, the statements Petitioner made to Sergeant Rinaldi were in large part the same as the responses Petitioner made during the first and third interrogations, which were lawfully admitted at trial. During the second interrogation Petitioner said he did not know how Lozada arrived at the $57,000 figure for the check and that the check was post-dated so that Lozada could liquidate some assets. H: 232–33. Petitioner was unable to explain what "flipping" the property meant. H: 233. During the first interrogation, Petitioner said Lozada chose the $57,000 amount and post-dated the check for tax reasons. H; 38–39; T2: 750–51. Petitioner was unable to explain what he

meant by "flipping" the property. *Id.* During the third interrogation, Petitioner repeated that Lozada chose the amount for the check. H: 52. Because the statements from the first and third interrogations were properly admitted at trial and were in substantial part the same as the statements made during the second interview, the erroneously admitted statements from the second interrogation could not have had a "substantial and injurious effect" in determining the jury's verdict.

> FN11. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

Accordingly, based upon an independent evaluation of the record, I respectfully recommend that Your Honor should conclude that Petitioner voluntarily waived his *Miranda* rights, his statements from the first and third interrogations were properly admitted, and the admission of his statements from the second interrogation was harmless error. Therefore, this claim does not provide a basis for habeas relief.

### 3. Weight of the Evidence

Petitioner's third claim for habeas relief is that the jury's verdict was against the weight of the evidence. Am. Pet. 8. Petitioner argues that he was "primarily convicted of this murder by way of testimony concerning his alleged prior robbery six months prior to the murder." *Id.* On appeal to the Appellate Division, Petitioner argued that without evidence of the prior robbery, the only evidence linking Petitioner to the crime scene were the bloody sneakers and the Bank of America call recording. Resp't's Ex. E. 53. Petitioner argued that Edna Saunders did not recall seeing the sneakers after she and Petitioner sold their prior house. *Id.* In addition, Petitioner argued an allele 10 in the sneakers did not belong to Petitioner or his family, which demonstrates there was someone else's DNA in the shoes. *Id.* at 53–54. With regard to the Bank of America call recording, Petitioner argued that it was unreliable because Edna Saunders did not recognize

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

the Defendant's voice in the recording and there was not enough of a recording for the Federal Bureau of Investigation to conduct an analysis of it. *Id.* at 54. Thus, Petitioner argued that, without the evidence of the prior robbery, the jury was not justified in finding Petitioner guilty beyond a reasonable doubt. *Id.* This claim was included in Petitioner's application for leave to appeal the Appellate Division's decision, which was denied by the Court of Appeals. Resp't's Ex. I.

### i. The Legal Standard

**\*20** It is well-settled that weight-of-the-evidence claims are purely state law claims and are not cognizable on habeas review. *See Klosin v. Conway,* 501 F.Supp.2d 429, 439 n. 2 (W.D.N.Y.2007) (collecting cases). As summarized in *Ganett v. Perlman,* 438 F.Supp.2d 467, 470 (S.D.N.Y.2006):

> Unlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is "an error of state law, for which habeas review is not available." *Douglas v. Portuondo,* 232 F.Supp.2d 106, 116 (S.D.N.Y.2002). "A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)" which empowers New York State intermediate appellate court to make weight of the evidence determinations. *Correa v. Duncan,* 172 F.Supp.2d 378, 381 (E.D.N.Y.2001). In making a "weight of the evidence" argument, Petitioner has not asserted a federal claim as required by 28 U.S.C. § 2254(a). Instead, he has raised an error of state law, for which habeas review is not available. *See Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (habeas corpus review not available to remedy alleged error of state law).

To make out a sufficiency of the evidence claim, Petitioner must show that the Appellate Division's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. §

2254(d)(1). A decision can be "contrary to" the precedent established by the Supreme Court in two ways: first, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court]," or, second, "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision can involve an "unreasonable application" of the Supreme Court precedent when the state court either "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

A challenge to the sufficiency of the evidence must be rejected if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When considering the sufficiency of the evidence of a state conviction "[a] federal court must look to state law to determine the elements of the crime." *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir.2002) (quoting *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999)). A petitioner "bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 811 (2d Cir.2000) (citation omitted).

### ii. Application of Law to Instant Case

**\*21** Petitioner's weight of the evidence claim is not cognizable for habeas corpus review. *See* 28 U.S.C. § 2254(a); *Ex parte Craig,* 282 F. 138, 148 (2d Cir.1922), *aff'd,* 263 U.S. 255, 44 S.Ct. 103, 68 L.Ed. 293 (1923); *Garrett,* 438 F.Supp.2d at 470. Even if the petition is construed to allege a sufficiency of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

evidence claim, Petitioner still would not be entitled to habeas relief. In this case, a jury found Petitioner guilty on (1) four counts of murder in the second degree; (2) one count of kidnapping in the first degree, (3) one count of robbery in the first degree, (4) one count of burglary in the first degree, and (5) one count of criminal possession of a weapon in the second degree. Viewing the evidence in the light most favorable to the prosecution, there is sufficient evidence from which a rational trier of fact could find, beyond a reasonable doubt, the elements of the felonies for which Petitioner was convicted.

Pursuant to N.Y. Penal Law § 125.25(1), "A person is guilty of murder in the second degree when ... [w]ith intent to cause the death of another person, he causes the death of such person or of a third person."

"A person is guilty of kidnapping in the first degree when he abducts another person and when ... [t]he person abducted dies during the abduction or before he is able to return or to be returned to safety." N.Y. Penal Law § 135.25(3). "Abduct" means to "restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly physical force." N.Y. Penal Law § 135.00(2), "Restrain" means to "restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful." N.Y. Penal Law § 135.00(1).

"A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime ... [i]s armed with a deadly weapon." N.Y. Penal Law § 160.15(2).

"A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime ... [i]s armed with explosives or a deadly weapon." N.Y. Penal Law § 140.30(1).

"A person is guilty of murder in the second degree when ... [a]cting either alone or with one or more other persons, he commits or attempts to commit robbery, burglary, [or] kidnapping ... and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants...." N.Y. Penal Law § 125.25(3).

**\*22** "A person is guilty of criminal possession of a weapon in the second degree when ... with intent to use the same unlawfully against another, such person ... possesses a loaded firearm." N.Y. Penal Law § 265.03(3).

Evidence at trial included the following details. Lozada was restrained with duct tape and a pillowcase around his head while seated in a chair. T2: 479–80, 542, 954–58, 995–96. A yellow chair was brought from Lozada's living room to the bedroom. T2: 479–80, 995–96. The pattern of blood on the yellow chair and the bullet wounds in Lozada's head indicated that Lozada was seated when he was shot. T2: 479–80, 995–96, 1151–52. Lozada was shot in the face and head with a gun and died as a result of the bullet wounds. T2: 1148–49, 1157.

Lozada's personal items were found in the garbage bin outside Petitioner's house, along with bloody sneakers and other items stained with Lozada's blood, as discussed *supra*. Petitioner denied that he had ever seen the sneakers. T2: 773. However, Edna Saunders testified that those sneakers belonged to Petitioner and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

DNA analysis of portions inside the sneakers could not exclude Petitioner. T2: 574–76, 1000–01, 1071–72. Petitioner suggested that Bernardez deposited the evidence in the garbage bin outside Petitioner's home, but such an argument does not undermine the evidence supporting a finding that Petitioner actively conspired with Bernardez to commit the murder. Bernardez's DNA profile was excluded from the DNA collected inside the bloody sneakers, and the only logical conclusion from the evidence was that Petitioner had worn the sneakers during the murder. T2: 1072. Forensic analysis of the black plastic garbage bags containing the items from the crime scene demonstrated that the bags were very likely from the opened box of black garbage bags underneath Petitioner's sink. T2: 823–29, 838. Petitioner claimed Edna Saunders bought the box of garbage bags, but Edna Saunders refuted this claim. T2: 579–80, 774. The night before and on the date of the murder Petitioner had called the cell phone number and home number of Bernardez, whose DNA profile matched the wall markings in Lozada's home. T2: 780, 859–62, 1078, 1095–97. Detectives recovered from Bernardez's home a box of .22–caliber cartridges of the same type and classification as the bullet fragments retrieved from Lozada's head. T2: 622, 625, 629, 1134–36, 1138. The evidence of Petitioner's participation in the Davis robbery further proves Petitioner's identity in perpetrating the very similar crimes against Lozada. T2; 635–60.

Petitioner's story about the $57,000 check was uncorroborated by any other evidence in the record and was inconsistent with testimony from Lozada's investment advisor and Petitioner's realtor Castaldi. T2: 310–11, 356–58. Detective Piedade identified Petitioner's voice on the Bank of America call recording. T2: 788. Petitioner did not own the property he claimed to be selling to Lozada, and there were no records found of any communications, negotiations, or documents related to this alleged real estate sale. T2: 749–50.

**\*23** Furthermore, the People presented evidence of Petitioner's motive to commit the crimes for which he was convicted. Petitioner had the financial need for the down payment on the Lincoln Avenue property and would have lost his $10,000 deposit had he not paid his down payment. T2: 360. He had already previously lost $47,000 on a prior failed real estate transaction, and he had already promised Edna Saunders that they would be moving into the Lincoln Avenue property in the beginning of 2007. T2: 352–53, 567, 576–77, 580. Castaldi testified that Petitioner said the $57,000 check was for Petitioner's own down payment. T2: 356–58.

Although Petitioner points out certain weaknesses in the People's evidence-such as Edna Saunders testifying she was not sure the third voice on the recording of the Bank of America call was Petitioner's [FN12]-the standard of review requires the evidence to be viewed "in the light most favorable to the prosecution." *See Jackson,* 443 U.S. at 319. Contrary to Petitioner's claim that he was primarily convicted based on evidence of the Davis robbery, the People presented sufficient evidence, in addition to the Davis robbery, to establish Petitioner's participation in Lozada's murder. Given the evidence discussed above, Petitioner has not met his "heavy burden" to show that no rational trier of fact could find beyond a reasonable doubt the elements of the crimes for which he was convicted. Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

FN12. T2: 584.

### III. *CONCLUSION*

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the instant petition be dismissed.

### IV. *NOTICE*

Pursuant to 28 U.S.C. § 636(b)(1), as amended,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2624763 (S.D.N.Y.)
**(Cite as: 2014 WL 2624763 (S.D.N.Y.))**

and Fed.R.Civ.P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed.R.Civ.P. 6(d), or a total of seventeen (17) working days, *see* Fed.R.Civ.P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Cathy Seibel at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

Fild May 16, 2014.

S.D.N.Y.,2014.
Saunders v. Lavalley
Slip Copy, 2014 WL 2624763 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Randy WILENS, Petitioner,
v.
SUPERINTENDENT OF CLINTON CORREC-
TIONAL FACILITY, Respondent.

No. 11–CV–1938 (JFB).
Dec. 31, 2013.

Randy Wilens, pro se.

Thomas Spota, District Attorney of Suffolk County,
by Michael Herman Blakey, Riverhead, NY, for Re-
spondent.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

*1 Randy Wilens ("Petitioner") petitions this
Court for a writ of habeas corpus, pursuant to 28
U.S.C. § 2254, challenging his October 25, 2005
conviction in state court. Under Suffolk County In-
dictment Number 1020–2005, Petitioner was charged
with two counts of Course of Sexual Conduct Against
a Child in the First Degree (N.Y. Penal Law §
130.75(1)(a)), two counts of Course of Sexual Con-
duct Against a Child in the Second Degree (N.Y.
Penal Law § 130.80(1)(a)), three counts of Sexual
Abuse in the First Degree (N.Y. Penal Law §
130.65(3)), and five counts of Endangering the Wel-
fare of a Child (N .Y. Penal Law § 260.10(1)). Peti-
tioner pled guilty to the indictment and was sentenced,
as a prior felony offender, to an aggregate term of
fourteen years' incarceration with five years
post-release supervision ("PRS").

Petitioner now challenges his conviction, arguing
that: (1) his Fourteenth Amendment due process rights
were violated because he was not informed of the
mandatory post-release supervision ("PRS") as a
component of his sentence; (2) he received ineffective
assistance of counsel when his attorney failed to ad-
vise him of PRS accompanying the sentence, failed to
object to duplicate counts in the indictment, and failed
to file an appeal; (3) his allocution was insufficient to
support a conviction for the crimes alleged; and (4) the
District Attorney committed *Brady* and *Rosario* vio-
lations by failing to disclose Family Court findings
and medical reports related to the case.

For the reasons set forth herein, the Court finds
that Petitioner has not demonstrated any basis for
habeas relief. Most of Petitioner's claims are proce-
durally barred. In any event, all of Petitioner's claims
fail on the merits. The Court, therefore, denies the
petition in its entirety.

**I. BACKGROUND**

A. Facts

1. The Plea

On August 30, 2005, Petitioner entered a plea
before the Honorable Michael Mullen. Under advice
of counsel, Petitioner was sworn in (P. 4),[FN1] and
affirmed that he freely entered his guilty plea while
waiving his constitutional and statutory trial rights. (P.
5–6.) Petitioner allocuted to his guilt on the offenses
charged, admitting that: (1) at least three times within
a three month period between 2002 and 2004, he
subjected a female child, who was less than eleven
years of age, to sexual contact and sexual intercourse
for his sexual gratification (*id.* at 7–8); (2) between
September 2003 and July 2004, on three occasions
within a three month period, at his residence in Suf-
folk County, he had sexual contact with a male child,
who was less than eleven years of age, including one
incident of oral sexual conduct (*id.* at 9–10); (3) at his
residence in Suffolk County, in July 2004, he had
sexual intercourse with a male, who was less than

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

eleven years of age, for his own sexual gratification (*id.* at 11–12); (4) he had sexual contact with another male who was less than eleven years of age for his own sexual gratification (*id.* at 12–13); (5) he twice exposed himself to a female less than seventeen years of age (*id.* at 15–16); (6) in October 2004, at a house in Suffolk County, he had sexual contact with a female, who was under eleven years of age, for his own sexual gratification (*id.* at 13–14); (7) at a house in Suffolk County, in the autumn of 2004, he played pornographic video tapes for a minor under eleven years of age (*id.* at 14); (8) in the autumn of 2004, he displayed lewd images from his cell phone to a child under seventeen years of age (*id.* at 14–15); and (9) he endangered the physical, mental, and moral welfare of four children under seventeen years of age (*id.* at 16).

FN1. "P." refers to the plea transcript.

**\*2** The court was satisfied with the allocution and Petitioner was found guilty of all charges which consisted of: (1) two counts of Course of Sexual Conduct Against a Child in the First Degree (N.Y. Penal Law § 130.75(1)(a)); (2) two counts of Course of Sexual Conduct Against a Child in the Second Degree (N.Y. Penal Law § 130.80(1)(a)); (3) three counts of Sexual Abuse in the First Degree (N.Y. Penal Law § 130.65(3)); and (4) five counts of Endangering the Welfare of a Child (N.Y. Penal Law § 260.10(1)). (P. 16–17.)

2. The Sentencing

At the sentencing hearing on October 25, 2005, Petitioner was sentenced as a Persistent Felony Offender ("P.F.O.") after admitting to a prior conviction of Sodomy in the First Degree, a class "B" felony. (S.5–6.) FN2 The court sentenced Petitioner as follows: (1) for two counts of Course of Sexual Conduct Against a Child in the Second Degree, Petitioner was sentenced to two concurrent terms of seven-years' incarceration with three-years' PRS (*id.* at 9–10); (2) for two counts of Course of Sexual Conduct Against a Child in the First Degree, Petitioner was sentenced to

two concurrent terms of fourteen-years' incarceration with five-years' PRS (*id.* at 10); (3) for three counts of Sexual Abuse in the First Degree, the court sentenced Petitioner to three concurrent terms of seven-years' incarceration with three-years' PRS (*id.* at 10); and (4) for five counts of Endangering the Welfare of a Child, the court sentenced Petitioner to five concurrent terms of one year of incarceration. (*Id.* at 10–11.) All terms of the sentence were ordered to run concurrently.

FN2. "S." refers to the sentencing transcript.

B. Procedural History

Petitioner filed a notice of motion for sentence reduction on November 17, 2005. His court appointed defense counsel argued that, in the interest of justice, the sentence should be reduced from 14 years, to the minimum 10 years, as the imposed sentence was harsh and excessive. (Notice of Motion for Sentence Reduction, Dec. 31, 2007, Indictment Number 1020–2005.) Petitioner also wrote a letter to the Appellate Division seeking permission to file a *pro se* supplemental brief. The Appellate Division granted the request. Through his Supplemental Brief filed October 30, 2007, Petitioner claimed that his sentence was harsh and excessive and should be reduced because (1) his plea was unknowingly made, as he was not made aware of post-release supervision accompanying the plea, and (2) his counsel was ineffective for failing to raise specific *Brady* or *Rosario* material, failing to file an appeal, and failing to inform Petitioner of PRS. (Notice of Motion for Sentence Reduction–Supplemental Brief, Oct. 30, 2007, Indictment Number 1020–2005) The Appellate Division affirmed the sentence on March 4, 2008 without an opinion. *People v. Wilens,* 49 A.D.3d 570 (N.Y.App.Div.2008). Petitioner sought leave to appeal from the Court of Appeals, which was denied. *People v. Wilens,* 10 N.Y.3d 965, 863 N.Y.S.2d 149, 893 N.E.2d 455 (2008).

**\*3** Petitioner then filed a motion under N.Y.C.P.L. § 440.10 ("Pet'r's 440 Mot.") to vacate the

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

judgment with the Suffolk County Supreme Court, arguing that: (1) his plea was not knowingly, intelligently, and voluntarily made because he was not made aware of the PRS, thus violating his due process rights (Pet'r's 440 Mot. at 1–2); (2) he received ineffective assistance of counsel for failing to object to alleged duplicate counts on the indictment, failing to advise him of PRS, and coercing Petitioner to accept the plea agreement (*id.* at 3–4, 863 N.Y.S.2d 149, 893 N.E.2d 455); (3) the allocution was insufficient to cover the elements of the crimes (*id.* at 2, 863 N.Y.S.2d 149, 893 N.E.2d 455); and (4) the prosecutor committed *Brady* and *Rosario* violations for failing to disclose a finding of not guilty to a charge of abuse in Family Court. (*Id.* at 3–4.)

The Suffolk County Supreme Court denied the motion in full. *People v. Wilens,* Ind. No. 01020–2005 (Sup.Ct. Suffolk Cnty. Sept. 10, 2010). First, the court reasoned, based on the record, that Petitioner failed to show how his plea was unknowingly, unintelligently, or involuntarily made. *Id.* Furthermore, the court held that the claim was "wholly based on the record and as such not subject to review in a '440' proceeding." *Id.* (citing N.Y.C.P.L. § 440.10(2)(c); *People v. Byrdsong,* 234 A.D.2d 468, 651 N.Y.S.2d 903 (2d Dep't 1996)). Second, the court concluded that Petitioner failed to support his claim of ineffective assistance of counsel with any evidence other than a self-serving affidavit and was not borne out by the record. *Id.* (citing *People v. Mackenzie,* 224 A.D.2d 173, 637 N.Y.S.2d 128 (1st Dep't 1996)). Third, the court held that "[t]he defendant's claim that the impositions of a period of five years post release supervision was error requiring relief was again record based and not subject to review." *Id.* Fourth, the court held the alleged *Rosario* and *Brady* violations were presented without any evidence and had no merit. However, the court did not specifically address whether there was an insufficient allocution to cover the elements of the crimes (which had been raised in a one-sentence argument by Petitioner). *Id.* The Appellate Division denied Petitioner's certificate for

leave to appeal. *People v. Wilens,* A.D. No.2010–10180 (2d Dep't Dec. 23, 2010). Petitioner's motion to reargue the denial of leave to appeal was again denied by the Appellate Division. *People v. Wilens,* A.D. No 2010–10180 (2d Dep't Mar. 31, 2011).

Petitioner then filed a *pro se* Petition for Writ of Habeas Corpus ("Pet'r's Habeas Pet.") on August 22, 2011, raising four grounds for relief. First, Petitioner argues that his plea violated the Due Process Clause of the Fourteenth Amendment because it was not made voluntarily, knowingly, and intelligently, as he was not made aware that PRS was a component of his sentence. (Pet'r's Habeas Pet. at 1.) Second, Petitioner argues that he had ineffective assistance of counsel because his attorney failed to: (1) advise him of the direct consequences of PRS; (2) advise him of his right to appeal; (3) file an appeal; and (4) object to duplicate counts on the indictment. (*Id.* at 3, 863 N.Y.S.2d 149, 893 N.E.2d 455.) Third, Petitioner argues that his allocution was insufficient to support the elements of the crimes charged. (*Id.* at 6, 863 N.Y.S.2d 149, 893 N.E.2d 455.) Finally, Petitioner alleges that the prosecution committed *Brady* and *Rosario* violations by withholding certain medical records and a finding of 'Not Guilty' of abuse in his Family Court case, which related to this criminal matter. (*Id.* at 3–4.) Respondent filed a memorandum of law in opposition to the petition on July 27, 2012. ("Resp.Br.") The Court has fully considered the submissions and arguments of the parties.

## II. STANDARD OF REVIEW

**\*4** To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judg-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

ment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). " ' Clearly established Federal law' " is comprised of " 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: " 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.' " *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir.2001) (quoting *Williams,* 529 U.S. at 411). Additionally, while " 'some increment of incorrectness beyond error is required ... the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.' " *Id.* (quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.'* " *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir.2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir.2006)).

### III. DISCUSSION

For the reasons discussed below, this Court denies the petition for habeas corpus. As a threshold matter, the due process claim is procedurally barred because the state court found that claim to be a record-based claim that is not subject to review in a Section 440 motion. However, in an abundance of caution, the Court has analyzed the merits of every claim and concludes that Petitioner's claims are entirely without merit.

A. Procedural Bar

1. Exhaustion

**\*5** As a threshold matter, a district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida,* 549 U.S. 327, 333, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007), a petitioner must fairly present his federal constitutional claims to the highest state court having jurisdiction over them. *See Grey v. Hoke,* 933 F.2d 117, 119 (2d Cir.1991). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry,* 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)) (alteration in original and quotation marks omitted).

Passage through the state courts, in and of itself, "is not sufficient." *Picard,* 404 U.S. at 275. To provide the State with the necessary "opportunity," the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *see also Duncan,* 513 U.S. at 365–66. "A petitioner has fairly presented his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Jones v. Keane,* 329 F.3d 290, 294–95 (2d Cir.2003) (citation and internal quotation marks omitted). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye v. Att'y Gen. Of N.Y.,* 696 F.2d 186, 191–92 (2d Cir.1982) (en banc). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Id.* at 191–92 (footnote omitted).

## 2. State Procedural Requirements

Similar to the failure to exhaust a claim, the failure to satisfy the state's procedural requirements will deprive the state courts of an opportunity to address the federal constitutional or statutory issues in a peti-

tioner's claim. *Coleman v. Thompson,* 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " *Reyes v. Keane,* 118 F.3d 136, 140 (2d Cir.1997) (quoting *Coleman,* 501 U.S. at 735) (emphasis omitted). Where the petitioner "can no longer obtain state-court review of his present claims on account of his procedural default, those claims are ... to be deemed exhausted." *DiGuglielmo v. Smith,* 366 F.3d 130, 135 (2d Cir.2004). Notably, for exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Reyes,* 118 F.3d at 139 (citations and internal quotation marks omitted).

**\*6** However, even where a plaintiff properly exhausts his claim, exhaustion "does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo,* 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (citing *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); *Coleman,* 501 U .S. at 744–51)). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray,* 518 U.S. at 162.

The procedural bar rule in the review of applications for writs of habeas corpus is based on the "comity and respect" accorded to state judgments. *House v. Bell,* 547 U.S. 518, 536, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). The purpose of this rule is to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

maintain the delicate balance of federalism by re-
taining a state's rights to enforce its laws and to
maintain its judicial procedures as it sees fit. *Coleman,*
*501 U.S. at 730–31.*

Once it is determined that a claim is procedurally
barred under state rules, a federal court may review
such a claim on its merits only if the petitioner can
demonstrate both cause for the default and prejudice
resulting therefrom, or if he can demonstrate that the
failure to consider the claim will result in a miscar-
riage of justice. *Id.* at 750. A miscarriage of justice is
demonstrated in extraordinary cases, such as where a
constitutional violation results in the conviction of an
individual who is actually innocent. *Murray v. Car-*
*rier,* 477 U.S. 478, 496 (1986). To overcome proce-
dural default based on miscarriage of justice, peti-
tioner must demonstrate that in light of new reliable
evidence not presented at trial, " 'it is more likely than
not that no reasonable juror would have found peti-
tioner guilty beyond a reasonable doubt' " and would
require " 'new reliable evidence ... that was not pre-
sented at trial.' " *House,* 547 U.S. at 537 (quoting
*Schlup v. Delo,* 513 U.S. 324, 327 (1995)).

3. Application

"The burden of proving exhaustion lies with the
habeas petitioner." *Cartagena v. Corcoran,* No.
04–CV–4329, 2009 WL 1406914, at *3 (E.D.N.Y.
May 19, 2009). The Court concludes that Petitioner
has not met this burden with respect to his due process
claim, as it was not "fairly presented" in state court.
Petitioner never sought reversal of his conviction, but
rather merely sought a sentence reduction under state
law. As discussed *supra,* Petitioner on direct appeal
argued to reduce his sentence under N.Y.Crim. Proc.
Law 470.15(2)(c) and 470.20(6), claiming that it was
harsh and excessive. Courts have correctly found that
a prisoner's reliance on a state procedural law granting
courts discretionary authority to reduce sentences does
not "fairly present" a constitutional claim in state
court. *King v. Cunningham,* 442 F.Supp.2d 171, 181
(S.D.N.Y.2006) (collecting cases); *Castillo v.*

*Abrams,* No. 88–CV–1165, 1988 WL 96026, at *1–2
(S.D.N.Y. Aug. 24, 1988) ("Asking a state court to use
its discretionary authority to reduce a sentence [under
New York's Criminal Procedure Laws], without more,
is not enough to alert the court that the claim is of
constitutional dimension.") Accordingly, Petitioner's
due process claim is unexhausted, and thus, cannot be
reviewed by this Court.

**\*7** However, Petitioner, through his § 440.10
motion to vacate, did seek reversal on the same
grounds that he alleges in this petition-namely, (1) due
process violations because the plea was not knowingly
made; (2) ineffective assistance of counsel; (3) insuf-
ficient allocution; and (4) *Brady* and *Rosario* viola-
tions. Petitioner also argued that post-release super-
vision should not have been imposed. The Supreme
Court of Suffolk County, through its § 440.10 order,
made clear that the due process claim was procedur-
ally barred because it was recordbased. *People v.*
*Wilens,* Ind. No. 01020–2005 (Sup.Ct. Suffolk Cnty.
Sept. 10, 2010). Accordingly, Petitioner's claim that
his plea was not knowingly and voluntarily made is
procedurally barred because the court's ruling was
based on an independent and adequate state proce-
dural rule. [FN3]

> FN3. The Court did not address Petitioner's
> claim that his allocution was insufficient and
> it would appear that this claim is not cog-
> nizable on a § 440.10 motion to vacate.
> However, when a state court fails to address a
> claim, a Court must review it *de novo. See*
> *Cotto v. Fischer,* 09 CV 9813, 2012 WL
> 5500575, at \*39 (S.D.N.Y. Aug.23, 2012).
> As a threshold matter, Petitioner only ad-
> dressed this matter in a conclusory manner
> without any argument as to the specific
> challenge being made. Thus, the issue was
> not fairly presented to the state court. In any
> event, as addressed *infra,* the Court has re-
> viewed this claim and finds it to be plainly
> without merit.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

In order to overcome the procedural bar, Petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750. Petitioner has not satisfied this standard. Petitioner has not provided any explanation for his failure to properly exhaust the due process claim. Moreover, Petitioner has failed to demonstrate any prejudice for his failure to exhaust, and he has not demonstrated that a fundamental miscarriage of justice will take place if the Court fails to consider the procedurally defaulted claims. *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). In any event, that claim, as well as all of Petitioner's other claims, are without merit for the reasons discussed below.

B. Merits Analysis

1. Due Process Claim

Petitioner claims that his due process rights under the Fourteenth Amendment were violated because he was unaware of PRS accompanying his sentence. Therefore, he alleges that the plea was not made voluntarily, knowingly, and intelligently. As discussed below, this claim has no merit.

a. Legal Standard

"The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant ." *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (internal quotation marks and citations omitted)); *see also Parke v. Raley,* 506 U.S. 20, 28–29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) (plea is valid when it is both knowingly and voluntarily made). Where "a defendant is represented by counsel during the plea process, and enters his plea upon the advice of counsel, the voluntariness of the plea depends upon whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Hill,* 474 U.S. at 56 (internal quotation marks and citations omitted).

The Supreme Court has held that, under the Due Process Clause of the United States Constitution, a trial court can only accept a guilty plea which is done "voluntarily, knowingly, and intelligently, with sufficient awareness of relevant circumstances and likely consequences." *United States v. Adams,* 448 F.3d 492, 497 (2d Cir.2006) (internal quotation marks and citations omitted); *accord Godinez v. Moran,* 509 U.S. 389, 400, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). Although a guilty plea "is not ordinarily subject to collateral attack," it "may be collaterally attacked if it was not knowing or not voluntary...." *Salas v. United States,* 139 F.3d 322, 324 (2d Cir.1998); *see also U.S. ex rel Scott v. Mancussi,* 429 F.2d 104, 107 (2d Cir.1970) ("[A] conviction which is based upon an involuntary plea of guilty is inconsistent with due process of law and is subject to collateral attack by federal habeas corpus.").

**\*8** "A plea is considered 'intelligent if the accused had the advice of counsel and understood the consequences of his plea, even if only in a rudimentary way,' and it is considered 'voluntary if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally.' " *Manzullo v. New York,* No. 07 CV 744(SJF), 2010 WL 1292302, at \*5 (E.D.N.Y. Mar.29, 2010) (quoting *Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.1988)). Indeed, a "plea of guilty entered by one fully aware of the direct consequences of the plea is voluntary in a constitutional sense unless induced by threats, misrepresentations, or perhaps by promises that are by their nature improper." *Bousley v. United States,* 523 U.S. 614, 619, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal alteration, citations, and quotation marks omitted).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

b. Application

Under New York law, the trial court should have advised Petitioner of the five-year mandatory PRS. In *People v. Catu,* the Court of Appeals held that "[b]ecause a defendant pleading guilty to a determinate sentence must be aware of the postrelease supervision component of that sentence in order to knowingly, voluntarily and intelligently choose among alternative courses of action, the failure of a court to advise of postrelease supervision requires reversal of the conviction." 4 N.Y.3d 242, 245, 792 N.Y.S.2d 887, 825 N.E.2d 1081 (2005).

However, under AEDPA, this Court may only grant relief if the state court "unreasonably applied clearly established Federal law." *Carey v. Musladin,* 549 U.S. 70, 77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006) (alterations omitted) (quoting 28 U.S.C. § 2254(d)(1)). " 'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Green v. Travis,* 414 F.3d 288, 296 (2d Cir.2005) (quoting *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Therefore, this Court cannot grant a petition for habeas corpus if the state court unreasonably applied *state* law; instead, this Court may only grant relief unless the state court unreasonably applied federal law that has been clearly defined by Supreme Court precedents (or was a result of an unreasonable determination of the facts in light of the record). *See Knowles v. Mirzayance,* 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (citations and internal quotation marks omitted)).

"Unfortunately for Petitioner, there is no clearly established Supreme Court precedent that a defendant

must be advised of mandatory post-release supervision prior to entering a guilty plea. Many federal courts in this Circuit have recently come to this same conclusion." *Sanchez v. Keller,* 06–CIV–3370, 2007 WL 4927791, at *7 (S.D.N.Y. Dec.4, 2007) (Report and Recommendation); *see also Facen v. Cully,* 787 F.Supp.2d 278, 284 (W.D.N.Y.2011) (stating that "the Supreme Court has never held that a mandatory term of post-release supervision is a direct consequence of a criminal conviction"); *Potter v. Green,* 04–CV–1343, 2009 WL 2242342, at *6 (E.D.N.Y. July 24, 2009) ("[T]here is no clearly established Supreme Court precedent that requires a state court judge to advise a defendant of mandatory PRS before accepting a guilty plea."). In fact, as noted by the Seventh Circuit, "the Court has expressly declined to decide such an issue in the very similar context of parole." *Lockhart v. Chandler,* 446 F.3d 721, 724 (7th Cir.2006) (citing *Lane v. Williams,* 455 U.S. 624, 630 n. 9, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982)). This Court finds the analysis contained in these cases persuasive.

**\*9** Therefore, because the Supreme Court has not ruled directly on this issue, the failure of the state court to advise Petitioner at his plea about the mandatory PRS is not a basis for habeas relief. *See Sanchez,* 2007 WL 4927791, at *8 ("[B]ecause the Supreme Court has never addressed the issue of whether mandatory supervised release is a direct consequence of one's conviction, the trial court's failure to inform Petitioner of his mandatory PRS cannot be a violation of clearly established federal law. In other words, Petitioner's claim is without merit because there is no clearly established Supreme Court precedent for the trial court to have unreasonably applied."); *see also Lane,* 446 F.3d at 724; *Facen,* 787 F.Supp.2d at 284; *Menjivar v. Sears,* 06 CV 2854, 2007 WL 2274892, at *3 (E.D.N.Y. Aug.7, 2007).[FN4]

FN4. As stated *supra,* even if the state court did violate New York law, Petitioner is also not entitled to relief because this claim is procedurally barred.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

In addition, although this could end the Court's inquiry, the Court notes that Petitioner must also demonstrate that "there is a reasonable probability that, but for the error, he would not have entered the plea." *Zhang v. United States,* 506 F.3d 162, 168 (2d Cir.2007) (citation and internal quotation marks omitted). Petitioner provides no evidence that he would not have entered his guilty plea had the court informed him of the mandatory PRS, and it appears highly improbable that the PRS played any role in his decision to accept or reject the plea. In fact, during the sentencing hearing, Petitioner admitted that the plea bargain, struck by him and for his benefit, was "favorable." [FN5] (S. at 7.) More importantly, Petitioner was made aware of the PRS at his sentencing hearing. For each charge, the sentencing state judge, informed Petitioner of the mandatory five-year PRS accompanying the charges. (S. at 10.) At no time did Petitioner object to the PRS, indicate that he was unaware that PRS was mandated in accordance with state law, or state that he wished to withdraw his previously entered plea. Therefore, as in *Sanchez,* "Petitioner's claim-that the failure to inform him of mandatory PRS prior to the entry of his guilty plea was a violation of his due process rights-can be dismissed as harmless error, because even if he had know about the PRS, such knowledge would likely not have affected his decision." *Sanchez,* 2007 WL 4927791, at *9.

> FN5. As Respondent notes, "All terms of incarceration were ordered to run concurrently, for an aggregate sentence of fourteen years for his sexual assaults and lewd behavior against eight children. Had petitioner gone to trial and been found guilty, as a second child sexual assault felony offender, petitioner faced a maximum sentence of two life terms, plus 48 years." (Resp. Opp. at 11.)

2. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of counsel, specifically that his counsel

failed to object to duplicate counts on the indictment, failed to file a Notice of Appeal, and failed to advise him of the PRS accompanying the guilty plea. As discussed below, this claim is meritless.

a. Legal Standard

Under the standard promulgated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 680, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

**\*10** The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' " *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir.2005) (quoting *Strickland,* 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a " 'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.' " *Id.* (quoting *Rompilla v. Beard,* 545 U.S. 374, 408, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.' " *Id.* (quoting *Strickland,* 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord,* 77 F.3d 578, 588 n. 3 (2d Cir.1996), and " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *Id.* at 588 (quoting *Strickland,* 466

U.S. at 690–91). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id.* (quoting *Strickland,* 466 U.S. at 690–91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they " 'undermine[ ] confidence in the outcome.' " *Pavel v. Hollins,* 261 F.3d 210, 216 (2d Cir.2001) (quoting *Strickland,* 466 U.S. at 694). " '[T]he question to be asked in assessing the prejudice from counsel's errors ... is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilty.' " *Henry v. Poole,* 409 F.3d 48, 63–64 (2d Cir.2005) (quoting *Strickland,* 466 U.S. at 695). " 'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.' " *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir.2001) (quoting *Strickland,* 466 U .S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of Strickland, the determination of prejudice may be made with the benefit of hindsight ." *Hemstreet v. Greiner,* 491 F.3d 84, 91 (2d Cir.2007) (internal citation and quotation marks omitted).

**\*11** This Court proceeds to examine Petitioner's claim, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin,* 366 F.3d 95, 100 (2d Cir.2004).

b. Application

i. Failure to Object to Duplicate Counts on the Indictment

Petitioner alleges that his trial counsel failed to object to duplicate counts contained within the indictment. Specifically, Petitioner asserts that under N.Y. Penal Law § 130.75(2) and N.Y. Penal Law § 130.80(2), a defendant may not be subsequently prosecuted for any other sexual offense involving the same victim. Petitioner argues that he was charged twice for acts upon the same victim under Counts I and III, and for Counts II and IV, and that he suffered prejudice as a result of the his attorney's inaction.

First, this Court finds defense counsel's conduct was not deficient because he sought to have the indictment dismissed on any plausible grounds. Defense counsel filed a motion for the trial court to review the Grand Jury minutes and sought dismissal of the charges. The court, in response to counsel's motion, concluded that the minutes were sufficient and denied counsel's application to dismiss or reduce the charges. *People v. Wilens,* Ind. No. 1020–2005 (Sup.Ct., Suffolk Cnty. July 26, 2005).

Second, Petitioner has failed to show that these alleged duplicate counts caused any prejudice and thus fails the second prong under the *Strickland* test. The New York legislature was careful to avoid double jeopardy concerns under N.Y. Penal Law § 130 .75(2) and § 130.80(2) by enacting N.Y. Penal Law § 70.25(2)(e). N.Y. Penal Law § 70.25(2)(e) states:

Whenever a person is convicted of course of sexual conduct against a child in the first degree as defined in section 130.75 or course of sexual conduct against a child in the second degree as defined in section 130.80 and any other crime under article one hundred thirty committed against the same child and within the period charged under section 130.75 or 130.80, the sentences *must run concurrently*.

N.Y. Penal Law § 70.25(2)(e) (emphasis added).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

At sentencing, Petitioner was sentenced to fourteen years and seven years for Counts One and Three, respectively. For Counts Two and Four, the state judge again sentenced the Petitioner to fourteen and seven years, respectively. The sentences were to run concurrently, not consecutively. Therefore, Petitioner was not subject to prejudice, and his claim must fail.

Furthermore, by pleading guilty, the Petitioner waived any argument that counsel was ineffective for failing to challenge the indictment. *See Schwartz v. Connell,* 05 CIV. 10305, 2006 WL 3549660, at *5 (S.D.N.Y. Dec.6, 2006) ("A motion to dismiss for a duplicitous indictment is similar to a speedy trial motion in that both can result in a dismissal of charges against the defendant. Both errors, however, are rendered irrelevant in the face of defendant's plea of guilty since this admission is, in most cases, convincing factual evidence of actual guilt."); *People v. Thomas,* 2 A.D.3d 982, 768 N.Y.S.2d 519, 520 (3d Dep't 2003) (holding a claim of ineffective assistance of counsel, predicated on counsel's failure to challenge the indictment, was waived as the alleged failures did not undermine the voluntariness of defendant's guilty plea).[FN6]

> FN6. The Court notes that, for the reasons discussed *infra,* Petitioner has not made any plausible argument that his guilty plea was not voluntary and intelligent that would allow him to now argue that this argument should not be waived.

ii. Failure to File a Notice of Appeal

**\*12** Petitioner claims that his trial counsel was ineffective because counsel did not file a Notice of Appeal. In *Roe v. Flores–Ortega,* 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), the Supreme Court applied the *Strickland* test with regard to a claim that counsel was constitutionally ineffective for failing to file a Notice of Appeal. The Court noted that it had "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal

acts in a manner that is professionally unreasonable." *Id.* at 477. However, the Court held that, in cases where the defendant "neither instructs counsel to file an appeal nor asks that an appeal not be taken," the first question is whether counsel "in fact consulted with the defendant about an appeal." *Id.* at 478. If the attorney consulted with the defendant, counsel "performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Id.* If, however, counsel has not consulted with the defendant, the relevant inquiry is "whether counsel's failure to consult with the defendant itself constitutes deficient performance." *Id.* The Court rejected a bright-line rule that counsel must always consult with a defendant regarding an appeal. *Id.* at 480. Instead, the Court held that "counsel has a constitutionally-imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal ... or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Id.* In making this determination, courts should consider "whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Id.* Where a defendant pleads guilty, courts should consider factors such as "whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Id.* If the court determines that counsel's performance was deficient, the court must turn to the second prong of the *Strickland* rule-whether counsel's deficient performance prejudiced the defendant. "[T]o show prejudice in these circumstances, a defendant must demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Id.* at 484. If so, a presumption of prejudice arises. *Id.*

In the instant case, Petitioner, in his *pro se* ap-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

pellate brief, repeatedly states that he attempted to contact and inform his attorney to file an appeal, but his attempts were futile. (Pet'r's Habeas Pet. at 3.) Assuming that no such consultation occurred, the relevant question becomes whether "there is reason to think either (1) that a rational defendant would want to appeal, or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." *Flores–Ortega,* 528 U.S. at 480.

**\*13** Petitioner pled guilty, which "reduces the scope of potentially appealable issues" and "may indicate that the defendant seeks an end to judicial proceedings." *Id.* However, Petitioner has a right to appeal, and his attorney must respect this right. Assuming *arguendo* that counsel's performance was deficient for failing to appeal or failing to consult Petitioner about an appeal, that deficiency did not create any prejudice and fails the second prong of *Strickland.* Petitioner filed his own Notice of Appeal in a timely manner. Subsequently, Petitioner was assigned appellate counsel. Appellate counsel filed a motion with the Appellate Division to reduce Petitioner's sentence and Petitioner was able to file his own *pro se* supplemental brief. Not only did appellate counsel raise what he believed to be a meritorious issue on appeal, but Petitioner himself raised his own issues. Both motions were heard and subsequently denied. Therefore, Petitioner did not suffer any prejudice. *See id.* at 484 (rejecting rule that failure to file appeal results in prejudice *per se* because this rule "ignores the critical requirement that counsel's deficient performance must actually cause *the forfeiture of the defendant's appeal."* ) (emphasis added).

### iii. Failure To Advise Him Of The Mandatory PRS Accompanying The Guilty Plea

Petitioner alleges his defense counsel was ineffective for failing to advise him of the mandatory post-release supervision, which accompanied his guilty plea. This argument fails the second prong under the *Strickland* test because Petitioner cannot show prejudice based on his lack of knowledge. Under

*Strickland,* a habeas petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. Nothing in the record indicates that Petitioner would not have pled had he been informed of the mandatory PRS. *Walker v. Pearlman,* 556 F.Supp.2d 259, 265 (S.D.N.Y.2008) (holding that knowledge of a five-year PRS period would have not changed the defendant's plea).

Petitioner does allege that, had he known about the PRS, he would not have pled guilty. In fact, Petitioner was made fully aware of PRS at his sentencing hearing, and made no objection or any attempt to withdraw his guilty plea. In his *pro se* supplemental brief to the Appellate Division on appeal, Petitioner again did not seek to withdraw his guilty plea. Furthermore, as stated above, had Petitioner gone to trial and been found guilty of the charges, he faced two life sentences. In addition, any period of incarceration connected with these charges carries with them a mandatory period of post-release supervision. N.Y. Penal Law § 70.80(3). Under the circumstances, even assuming *arguendo* the allegation of ineffective assistance to be true, there is no basis to conclude that Petitioner suffered any prejudice under the second prong of *Strickland.*

### 3. Insufficient Allocution

**\*14** Petitioner alleges his allocution was insufficient in establishing the elements of the crimes of which he was convicted. For the reasons stated, the Court finds this claim to be without merit.[FN7]

> FN7. The state court did not address Petitioner's contention that his allocution at his plea was insufficient, and thus, this claim is not entitled to AEDPA deference. *See, e.g., Bell v. Napoli,* 08 CIV 9900, 2010 WL 8039333, at \*23 n. 13 (S.D.N.Y. Aug.24, 2010) (Report and Recommendation). However, even under *de novo* review, Petitioner's claim is plainly without merit.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

i. Allocution Under Penal Law § 130.75(1)(a) (Course of sexual conduct against a child in the first degree)

In analyzing the transcript of the plea, it is clear that Petitioner provided a sufficient allocution for each element of the crimes charged. N.Y. Penal Law § 130.75(1) (Course of sexual conduct against a child in the first degree) reads:

A person is guilty of course of sexual conduct against a child in the first degree when, over a period of time not less than three months in duration:

(a) he or she engages in two or more acts of sexual conduct, which includes at least one act of sexual intercourse, oral sexual conduct, anal sexual conduct or aggravated sexual contact, with a child less than eleven years old

N.Y. Penal Law § 130.75(1). Under this statute, the prosecutor must show that over a three-month period or more, the defendant engaged in at least two acts of sexual conduct.

Petitioner admitted in great detail to the specific oral sexual conduct between himself and the victims, which occurred well over a three-month period. Petitioner also admitted that these victims were children under the age of eleven. In particular, during the allocution, petitioner admitted in part that, (1) within a three-month period between 2002 and 2004, on at least three occasions at his residence in Suffolk County, he subjected the female child "DM" (who was under the age of eleven) to sexual contact and sexual intercourse for Petitioner's sexual gratification (P. 7–8); and (2) within a three-month period from between September 2003 and July 2004, on at least three occasions at his residence, Petitioner had sexual contact with the male child "DM" (who was under the age of 11), including one incident of oral sexual conduct. (P. 8–12.) Petitioner's allocution covered all of the requisite elements and was sufficient to find him

guilty of the charges under Penal Law § 130.75(1)(a) (Course of sexual conduct against a child in the first degree).

ii. Allocution under Under Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree)

In relevant part, N.Y. Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree) reads:

A person is guilty of course of sexual conduct against a child in the second degree when, over a period of time not less than three months in duration:

(a) he or she engages in two or more acts of sexual conduct with a child less than eleven years old.

N.Y. Penal Law § 130.80(1)(a). Under this statute, the prosecutor must show that over a three-month period or more, the defendant engaged in two or more acts of sexual conduct with a child less than eleven years old. "Sexual conduct" means sexual intercourse, oral sexual conduct, anal sexual conduct, aggravated sexual contact, or sexual contact. N.Y. Penal Law § 130.00(10).

**\*15** The plea transcript provides sufficient evidence that Petitioner is guilty under N.Y. Penal Law § 130.80(1)(a) (Course of sexual conduct against a child in the second degree). As discussed supra, Petitioner admitted to sexual conduct with a child under the age of eleven. He also admitted that this conduct occurred for a period of at least three months. Moreover, he allocuted to conduct that clearly fell within the definition of oral sexual conduct. (P. 9–11 .) Thus, each element under Penal Law § 130.80(1)(a) was satisfied.

Petitioner furthers argues that dialogue between the prosecutor and himself during the plea was insufficient to support the charge because his admission

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

was preceeded by six denials. (Pet'r's Habeas Pet. at 2.) He asserts that the state court should have, "looked further into the reasons of denials of alleged acts before accepting the insufficient pleas." (*Id.* at 2.)

The Court disagrees. By looking at the totality of the guilty plea proceeding, instead of a few isolated lines as Petitioner suggests, it is clear that the plea was voluntary. There is no evidence that the prosecutor or anyone else threatened Petitioner to induce a coerced plea. The court simply gave Petitioner another opportunity to explain what had occurred. Subsequently, Petitioner provided a sufficient allocution and made a proper plea. In short, there is no basis to challenge the Petitioner's statements at the guilty plea, including the voluntariness of those statements.

iii. Allocution Under Penal Law § 130.65 (Sexual Abuse in the First Degree)

N.Y. Penal Law § 130.65 (Sexual Abuse in the First Degree) states that "[a] person is guilty of sexual abuse in the first degree when he or she subjects another person to sexual contact: ... [w]hen the other person is less than thirteen years old and the actor is twenty-one years old or older." N.Y. Penal Law § 130.65.

The record is clear that the prosecution satisfied every element of this charge. Petitioner described in great detail sexual acts which satisfy subsection 4 of N.Y. Penal Law § 130.65. Petitioner, by his own admission, subjected his victims, who were all under the age of thirteen, to sexual contact. Because the Petitioner is older than twenty-one years of age, the elements are satisfied, and thus his allocution was sufficient.

iv. Allocution Under Penal Law § 260.10(1) (Endangering the Welfare of Child)

Lastly, under the N.Y. Penal Law § 260.10(1) (Endangering the Welfare of Child):

A person is guilty of endangering the welfare of a child when:

1. He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health.

N.Y. Penal Law § 260.10(1). There is no requirement under this statute that the physical, mental or moral welfare of the child be in fact injured, and New York courts have held that actions similar to the ones admitted to by Petitioner violate the statute. *See, e .g., People v. Rice,* 17 N.Y.2d 881, 271 N.Y.S.2d 307, 218 N.E.2d 341 (1966); *People v. Dunavin,* 173 A.D.2d 1032, 1034, 570 N.Y.S.2d 369 (3d Dep't 1991) (evidence demonstrating that defendant showed minors sexually explicit film combined with touching minor's buttocks legally sufficient to establish crime of endangering welfare of child). The Court concludes that Petitioner's allocution under Penal Law § 260.10(1) (Endangering the Welfare of Child) was sufficient to satisfy all elements of the crime alleged. (P. 14–16.)

**\*16** In sum, Petitioner's claim that his allocution did not satisfy the elements of the crimes charged is plainly without merit.

4. *Brady* and *Rosario* Violations

Petitioner also claims *Brady* and *Rosario* violations, alleging that the prosecution withheld certain exculpatory evidence-namely, the victims' medical records and a finding of 'Not Guilty' in his Family Court case, which related to this criminal matter. (Pet. at 3–4) For the reasons set forth below, the Court finds that Petitioner's claim is without merit.

a. Legal Standard

For the purposes of federal habeas corpus review,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

a habeas petition can only be granted to remedy some violation of federal law. Because the obligation to turn over *Rosario* material arises under state law, to the extent that this claim is based on a *Rosario* violation, it must fail. Thus, the only question is whether the prosecution violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. *See King v. Greiner,* No. 02–CV–5810, 2008 WL 4410109, at *38 n. 41 (S.D.N.Y. Sept.26, 2008).

Under *Brady,* the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to prevail on a *Brady* claim, petitioner must demonstrate that material evidence favorable to his case was not disclosed to him. *See Kyles v. Whitley,* 514 U.S. 419, 437–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("[T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Failure to disclose such material evidence merits relief only if the prosecution's failure " 'undermines confidence in the outcome of the trial.' " *Kyles,* 514 U.S. at 434 (quoting *Bagley,* 473 U.S. at 678). Furthermore, "[t]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281.

b. Application

Petitioner argues that the outcome of his case would have been different if the prosecutor submitted medical records and a Family Court verdict of 'Not

Guilty' of sexual abuse. Analyzing these claims, the Court finds them to be meritless. With regard to the Family Court adjudication, Petitioner makes conclusory statements without providing a shred of evidence before the Court beside his self-serving declaration.

The state record is devoid of any documentation from Family Court, which would be classified as exculpatory under *Brady.* Additionally, Petitioner failed to produce an affidavit from his attorney attesting to a favorable adjudication in the Family Court. In fact, Respondent submitted to the state court, in response to his Section 440 motion, court documents from Family Court indicating that the abuse petitions were granted on September 23, 2005. (Opp. to Section 440 Motion, Ex. B.)

**\*17** In any event, Petitioner was presumably present in Family Court during the proceedings. Therefore, he was aware of the evidence allegedly withheld, removing it from the scope of *Brady* material. Lastly, as noted above, a final Family Court disposition took place on September 23, 2005. Petitioner pled guilty in Criminal Court on August 30, 2005. There can be no argument that this disposition, which took place later in time, could have possibly influenced the outcome of his guilty plea (which had already taken place).

Similarly, the medical records at issue are neither exculpatory nor favorable to Petitioner. The medical records specifically state that the victims' medical history indicates that "inappropriate sexual contact" occurred. This statement is certainly not favorable to Petitioner. Although the records state that there were no abnormal findings *during* the exam, this has no bearing on whether the victims were abused in the past by Petitioner. Moreover, the medical record qualifies the examination by stating that the alleged acts would not cause "permanent changes in the patient's physical exam." Therefore, the medical records do not exculpate Petitioner and, thus, cannot be classified as *Brady* material.[FN8]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 28995 (E.D.N.Y.)
**(Cite as: 2014 WL 28995 (E.D.N.Y.))**

END OF DOCUMENT

FN8. In any event, such claims cannot provide a basis for habeas relief. The Supreme Court has never held that exculpatory material must be disclosed prior to a guilty plea. Therefore, a state court decision on that issue could not have been "contrary to clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A habeas petition may not be granted on an issue of law that has not yet been resolved. *See Friedman v. Rehal,* 618 F.3d 142, 154–55 (2d Cir.2010) (discussing *Ruiz* and holding that, because no clearly established federal law has been established as to the application of *Brady* to a guilty plea, such a claim was not cognizable on habeas review).

In sum, Petitioner's *Brady* and *Rosario* claims are without merit and do not provide a basis for habeas relief.

### IV. CONCLUSION

For the reasons set forth herein, this Court finds that Petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. All of Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall be issued. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

E.D.N.Y.,2014.
Wilens v. Superintendent of Clinton Correctional Facility
Slip Copy, 2014 WL 28995 (E.D.N.Y.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Melton George WILLIAMS, Petitioner
v.
Dennis J. BRESLIN, Superintendent, Respondent.

No. 06-CV-2479 (SJF).
Sept. 9, 2008.

Melton George Williams, Staten Island, NY, pro se.

New York State Attorney Generals Office, Joseph Huttler, Brooklyn, NY, for Respondent.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**I. INTRODUCTION**

**\*1** On June 16, 1999, a judgment of conviction was entered against petitioner Melton George Williams (petitioner) in the Supreme Court of the State of New York, Kings County (Firetog, J.). Following a bench trial, petitioner was found guilty of one (1) count of rape in the first degree (N.Y. Penal Law § 130.35(1)), three (3) counts of sexual abuse in the first degree (N.Y. Penal Law § 130.65(1)), one (1) count of rape in the third degree (N.Y. Penal Law § 130.25(1)), and one (1) count of endangering the welfare of a child (N.Y. Penal Law § 260.10). Petitioner was sentenced to concurrent terms of imprisonment of seven and one-half (7 1/2 ) to fifteen (15) years for the first-degree rape count, two (2) to six (6) years for the sexual abuse counts, one (1) to three (3) years for the third degree rape count and one (1) year for the endangering the welfare of a child count. On May 17, 2006, petitioner filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth herein, the petition is denied and the proceeding is dismissed.

**II. BACKGROUND**

**A. Factual Background**

The following facts were taken from the trial transcripts:

On the afternoon of May 31, 1998, thirteen (13) year-old Ranisha Grossett (Grossett complainant) was asked to babysit for her two cousins at petitioner's apartment so that petitioner could visit his daughter in the hospital. (Trial Transcript [Tr.] at 15, 17, 172). When Grossett arrived, only petitioner and his one (1) year-old son were present, as petitioner's seven (7) year-old daughter was at church. (Tr. at 18, 19-20).

While Grossett was sitting in a chair with her (1) one year-old cousin, petitioner sat beside her and began touching her inappropriately. (Tr. at 19). After telling petitioner to stop and pushing herself away from him, Grossett retreated to petitioner's daughter's bedroom. (Tr. at 20). Shortly thereafter petitioner entered the bedroom, "threw" Grossett on the bed, got on top of her and began kissing and touching her. (Tr. at 20-21). Grossett unsuccessfully attempted to push petitioner off of her. (Tr. at 21-22). Despite Grossett's repeated verbal and physical attempts to stop petitioner, (Tr. at 21, 23, 25-26), petitioner attempted to undress her by pulling down her tights and ripping her shirt, (Tr. at 22, 24). Though petitioner was unsuccessful in fully undressing Grossett, he managed to dislodge one of her legs from her pants and proceeded to engage in sexual intercourse with her. (Tr. at 24).

Following the incident, Grossett went to the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

bathroom and attempted to clean and re-dress herself. (Tr. at 27). She then went back into the bedroom where the encounter had taken place, packed up her belongings and waited for petitioner to leave. (Tr. at 28).

After petitioner left the apartment, Grossett attempted to call her aunt but was unable to reach her immediately and instead left multiple messages. (Tr. at 29-30). When Grossett's aunt finally returned her telephone call, Grossett relayed what had happened and her aunt went to petitioner's apartment. (Tr. at 32). Grossett returned home, told her mother about the incident and the police were notified. (Tr. at 33-34).

**\*2** The police arrived at Grossett's home, took a statement from her and proceeded to petitioner's apartment. (Tr. at 81). Arriving at petitioner's residence, the police knocked on the door and petitioner answered, identified himself as Melton Williams and confirmed that his niece had been there earlier that day. (Tr. at 82). The police then obtained petitioner's permission to enter his apartment and "see" his daughter's bedroom. (Tr. at 83). Upon entering the bedroom, the police observed freshly stained sheets on the bed, which were taken into custody. (Tr. at 83-84).

The police asked petitioner to step into the hallway where they placed him under arrest and read him his *Miranda* rights. (Tr. at 86). At the police station, petitioner was processed, his clothing was removed and taken into custody, and a detective was called to the station to interview petitioner. (Tr. at 87, 109-10). Petitioner made a statement as to what had occurred on May 31, 1998. (Tr. at 111-12).

B. Procedural History
On May 28, 1999, following a bench trial, petitioner was found guilty of one (1) count of rape in the first degree, three (3) counts of sexual abuse in the first degree, one (1) count of rape in the third degree and (1) count of endangering the welfare of a child. On

June 16, 1999, petitioner was sentenced to concurrent terms of imprisonment of seven and one-half (7 1/2 ) years for the first-degree rape count, two (2) to six (6) years for the sexual abuse counts, one (1) to three (3) years for the third degree rape count and one (1) year for the endangering the welfare of a child count.

Petitioner timely filed a direct appeal of his conviction with the New York Supreme Court, Appellate Division, Second Department (Appellate Division), in which he alleged: (1) that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt on the charges of rape in the first degree and sexual abuse in the first degree; (2) that the trial court's verdict was against the **weight** of the **evidence**; and (3) that his sentence was harsh and excessive. On December 31, 2001, the Appellate Division affirmed petitioner's judgment of conviction finding, *inter alia,* that the evidence was legally sufficient, the verdict was not against the **weight** of the **evidence**, the sentence imposed was not excessive and plaintiff's remaining contentions were without merit. *People v. Williams,* 289 A.D.2d 600, 735 N.Y.S.2d 212 (App.Div.2001). On March 29, 2002, the New York State Court of Appeals denied petitioner's application for leave to appeal the order of the Appellate Division. *People v. Williams,* 97 N.Y.2d 763, 769 N.E.2d 370, 742 N.Y.S.2d 624 (2002).

On December 9, 2002, petitioner moved, *pro se,* in New York State Supreme Court to vacate his judgment of conviction pursuant to N.Y.C.P.L. §§ 440.10 and 440.20. In his motion papers, petitioner claimed to have received ineffective assistance of trial counsel based upon his defense counsel's purported failed to; (1) introduce evidence that the complainant lied about an unrelated incident which allegedly involved petitioner; (2) elicit evidence of the complainant's alleged sexual activities; (3) call defense character witnesses; (4) investigate the admissibility of the "outcry" tape and complainant's ripped clothing; and (5) object at petitioner's sentencing to inac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

curacies in the probation report.

**\*3** By order entered June 18, 2003, the New York State Supreme Court summarily rejected petitioner's various ineffective assistance claims on the merits pursuant to N.Y.C.P.L. §§ 440.30(4)(b), (c). On December 30, 2003, petitioner was granted leave to appeal the denial of his motion to vacate. By decision and order dated December 12, 2005, the Appellate Division affirmed the denial of petitioner's motion to vacate, finding that the trial court's summary denial of petitioner's motion was "provident exercise of discretion" and that petitioner had failed to establish that "there were no strategic or other legitimate explanations for counsel's alleged shortcomings * * * or that [petitioner] was deprived of meaningful representation." People v. Williams, 24 A.D.3d 575, 805 N.Y.S.2d 295 (App.Div.2005) (citations omitted).

On January 31, 2006, the New York State Court of Appeals denied petitioner's application for leave to appeal the Appellate Division's December 12, 2005 order. People v. Williams, 6 N.Y.3d 782, 844 N.E.2d 804, 811 N.Y.S.2d 349 (2006).

On or about May 17, 2006, petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging: (1) that his conviction of rape in the first degree and sexual abuse in the first degree was against the **weight** of the **evidence**; (2) prosecutorial misconduct; and (3) ineffective assistance of trial counsel.

## III. DISCUSSION

### A. The AEDPA

#### 1. Exhaustion

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal

habeas corpus relief. Pursuant to the strictures outlined in the AEDPA, before a federal court is permitted to consider an application for habeas corpus relief, the petitioner must have exhausted all remedies available in the state court system. Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 808 (2d Cir.2000). The AEDPA exhaustion requirement is met if: (1) petitioner "has exhausted the remedies available in the courts of the state;" (2) petitioner demonstrates that "there is an absence of available State corrective process" for adjudicating the claim(s); or (3) though a state court process is available, "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1); see also Fama, 235 F.3d at 808.

The exhaustion requirement mandates that the petitioner "fairly present" both the factual and legal premises of his claim(s) to the highest state court. See Picard, 404 U.S. at 275, 92 S.Ct. at 512 (stating that "once the federal claim[s] [have] been presented to the state courts, the exhaustion requirement is satisfied."); Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004). In order for a petitioner to have "fairly presented" his claim(s), the petitioner "must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." Daye v. Atty. Gen. of the State of New York, 696 F.2d 186, 191 (2d Cir.1982); see also Picard, 404 U.S. at 276-77, 92 S.Ct. at 512-13. Specifically, this requires the petitioner to have clearly articulated all of the "essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." [FN1] Daye, 696 F.2d at 191; see also Baldwin, 541 U.S. at 32, 124 S.Ct. at 1351 (stating that "ordinarily, a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material ... that does so."). Where a petitioner presents additional facts to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

the federal court which either materially alter the claim or crucially affect its determination, the petitioner must present this evidence to the state court before the federal court is permitted to consider the claim. *Anderson v. Casscles,* 531 F.2d 682, 684 (2d Cir.1976).

> **FN1.** The court in *Daye* enumerated four specific methods by which a petitioner who has not cited a specific constitutional provision would nonetheless be deemed to have "fairly presented" his claim to state courts, including: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like factual situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Daye,* 696 F.2d at 194.

**\*4** Where a district court is faced with a "mixed" petition that contains both exhausted and unexhausted claims it may: (1) stay the proceeding pending complete exhaustion of state remedies; [FN2] (2) dismiss the petition, without prejudice, until the claims have been exhausted in state court, unless such review would be precluded pursuant to the AEDPA's one-year statute of limitations; (3) afford petitioner an opportunity to withdraw the unexhausted claim(s); or (4) deny the petition on the merits pursuant to 28 U.S.C. § 2254(b)(2). *See, e.g. Gandarilla v. Artuz,* 322 F.3d 182, 186 (2d Cir.2003); *Pratt v. Greiner,* 306 F.3d 1190, 1196-97 (2d Cir.2002). The petition in the instant case contains both exhausted and unexhausted claims. [FN3] Upon reviewing the options available to this court as enumerated *supra,* petitioner's petition is denied on the merits for the reasons set forth below.

> **FN2.** The Supreme Court has opined that a stay and abeyance should only be available in "limited circumstances" and that such a measure is "only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." In addition, the district court would be deemed to have abused its discretion if it were to grant petitioner a stay "when [petitioner's] unexhausted claims are plainly meritless." *Rhines v. Weber,* 544 U.S. 269, 277, 125 S.Ct. 1528, 1535, 161 L.Ed.2d 440 (2005).

> **FN3.** Petitioner's claim that his trial counsel "advised him not to have a trial by jury" because "it would be a waste of time and too much work for [counsel]" and that counsel allegedly bribed the petitioner to forego a jury trial by "giving [petitioner] a thousand dollars by way of reducing his attorney's fees, [and] by telling [petitioner] to keep the remaining money owed to [counsel] (Petition at 6), whether based on a theory of ineffective assistance of trial counsel or depriving 'petitioner of a fair trial, was not raised in the state courts and cannot be deemed exhausted since petitioner is not procedurally barred under New York State law from filing a successive 440.10 motion incorporating these factual allegations which were omitted from the first motion. Under N.Y.C.P .L. § 440.10(3)(c), a state court "may deny" a successive motion to vacate where "the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so." However, since § 440.10(3)(c), by its terms, makes such denials discretionary and does not impose an absolute bar on successive motions, petitioner cannot be said to be procedurally barred from raising this allegation in a subsequent motion. *See Bell v. Miller,* No. 05 CV 0663, 2005 WL 1962413, at *5 (E.D.N.Y. Aug. 12, 2005), *rev'd on other*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

*grounds,* 500 F.3d 149 (2d Cir.2007); *Bonilla v. Portuondo,* No. 00 Civ. 2369, 2004 WL 350694, at *15 (S.D.N.Y. Feb. 26, 2004) (holding that N.Y.C.P.L. § 440.10(3)(c) does not create a procedural bar from filing a successive motion and any denial is discretionary), *report and recommendation adopted by,* 2004 WL 1782174 (S.D.N.Y. Aug.9, 2004).

## 2. Procedural Default

Where a state court decision rests upon independent and adequate state procedural grounds, a federal habeas court is barred from reviewing the claims. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989); *Garcia v. Lewis,* 188 F.3d 71, 77-82 (2d Cir.1999). This is true even where the state court reaches the merits of petitioner's claims as an alternative holding. *See Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. at 1044, (stating that "a state court need not fear reaching the merits of a federal claim in an *alternative* holding ... [and] as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision" a federal habeas court is precluded from reviewing the claims.) (emphasis in original). Despite the operation of the independent and adequate state ground doctrine, petitioner's claims may be reviewed by a federal court where he can "demonstrate cause[ FN4] for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U .S. at 750, 111 S.Ct. at 2565.

FN4. Under the "cause and prejudice" test, sufficient "cause" will only be found where petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman,* 501 U.S. at 753, 111 S.Ct. at 2566 (quoting *Murray v. Carri-*

*er,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). In addition, "attorney ignorance or inadvertence" will not constitute sufficient "cause," as the attorney acts as petitioner's agent and therefore in the absence of a constitutional violation "petitioner bears the risk ... for all attorney errors made in the course of the representation." *Coleman,* 501 U.S. at 753-54, 111 S.Ct. at 2566-67.

## 3. Standard of Review for Claims Adjudicated on the Merits

Pursuant to the AEDPA, an application for a writ of habeas corpus that has met the procedural prerequisites shall not be granted unless the claim was adjudicated on the merits in state court and the state court decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is deemed to have been made on the merits where it "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001); *Jimenez v. Walker,* 458 F.3d 130, 140 (2d Cir.2006). Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). Alternatively, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413, 120 S.Ct. at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

1523. Pursuant to this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. at 1522. In addition, under the AEDPA, a state court's determination of factual issues "shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Sufficiency of the Evidence**

**1. Weight of the Evidence Claim**

**\*5** Petitioner's claim that his conviction was against the **weight** of the **evidence** fails to raise a federal constitutional issue and is therefore not cognizable on habeas review. *Douglas v. Portuondo,* 232 F.Supp.2d 106, 116 (S.D.N.Y.2002); *Santana v. Poole,* No. CV-03-3946, 2006 WL 3483923, at \*9 (E.D.N.Y. Nov.30, 2006). A **weight** of the **evidence** argument is a pure state law claim grounded in N.Y.C.P.L. § 470.15(5), which empowers the intermediate appellate courts of New York to make **weight** of the **evidence** determinations. *Correa v. Duncan,* 172 F.Supp.2d 378, 381 (E.D.N.Y.2001). Unlike a sufficiency of the evidence claim which is grounded on federal due process principles, *see Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 S.Ct. 475, 479-80, 116 L.Ed.2d 385 (1991), petitioner's **weight** of the **evidence** argument fails to assert a federal claim reviewable under 28 U.S.C. § 2254(a). Rather, petitioner simply "raises an error of state law for which habeas review is not available." *Douglas,* 232 F.Supp.2d at 116; *Poole,* 2006 WL 2483923, at \*9.

**2. Sufficiency of the Evidence**

Although petitioner failed to explicitly raise a sufficiency of the evidence claim in his federal habeas

corpus petition, this court will address this claim *sua sponte* as petitioner is a *pro se* litigant, *see Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (internal citation omitted); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (maintaining that "we read the pleadings of a pro se litigant liberally and interpret them 'to raise the strongest arguments that they suggest.' ") (internal quotations and citations omitted), and the state courts interpreted his claim as raising a legal sufficiency argument.

The Appellate Division, Second Department, found petitioner's sufficiency of the evidence claim "unpreserved for appellate review" pursuant to N.Y.C.P.L. § 470.05(2),[FN5] *People v. Williams,* 289 A.D.2d at 600-01, 735 N.Y.S.2d 212, and, alternatively, deemed it to be without merit since the evidence, viewed in the light most favorable to the prosecution, "was legally sufficient to establish the element of forcible compulsion as to those charges beyond a reasonable doubt." *Id.* at 601, 735 N.Y.S.2d 212. Since the Appellate Division clearly and explicitly invoked a state procedural rule "as a separate basis for [its] decision," *Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. at 1044, and petitioner has failed to allege cause for the default, actual prejudice, or that a fundamental miscarriage of justice would result if the claim were not reviewed, this claim is barred from federal habeas review. *See Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565.

> FN5. Under N.Y.C.P.L. § 470.05(2) "an objection to a ruling or instruction of a criminal court must be raised contemporaneously with the challenged ruling or instruction in order to preserve the objection for appellate review." *Green v. Travis,* 414 F.3d 288, 294 (2d Cir.2005) (citing *People v. Jones,* 81 A.D.2d 22, 29, 440 N.Y.S.2d 248 (App.Div.1981)). In addition, such an objection must be made "with sufficient specificity to enable the trial court to respond." *Id.* In the instant case, the Appellate Division clearly

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

stated that petitioner's claim of insufficiency of the evidence was unpreserved for appellate review as "[petitioner] did not specify this ground in his motion to dismiss at trial." *People v. Williams,* 289 A.D.2d at 600, 735 N.Y.S.2d 212.

C. Prosecutorial Misconduct

Petitioner alleges prosecutorial misconduct as the second ground in his habeas petition and claims that he raised the issue in his N.Y.C.P.L. § 440.10 motion to the trial court. However, review of petitioner's affidavit in support of his motion to vacate, as well as the trial court's opinion denying petitioner's motion, reveals that petitioner failed to fairly present this claim to the New York State courts. *See Picard,* 404 U.S. at 275, 92 S.Ct. at 512; *Daye,* 696 F.2d at 191. Petitioner's arguments presented in support of his motion to vacate referred only to the allegedly ineffective assistance of his trial counsel. The only allusion to prosecutorial misconduct in the state courts was petitioner's assertion that the prosecutor had been informed that an allegation concerning petitioner which was made by the complainant was allegedly false, and that if proven false, such information would be exculpatory and thus should have been given to the court.[FN6] However, this claim is insufficient to have constituted a "fairly presented" claim for prosecutorial misconduct since petitioner failed to set forth both the factual and legal premises of his prosecutorial misconduct claim in the state courts. Therefore, petitioner's prosecutorial misconduct claim has not been properly exhausted.

FN6. The complainant's allegedly false statement was contained in defendant's pre-sentence probation report and centered on an unrelated incident where petitioner allegedly confronted the complainant near her school and made an obscene gesture in her direction.

**\*6** Since petitioner failed to raise his claim of prosecutorial misconduct on direct appeal, the claim is procedurally defaulted pursuant to N.Y.C.P.L. § 440.10(2)(c) (requiring denial of a motion based on a constitutional violation where defendant's claims concern a matter of record and therefore would be appropriate only on direct appeal); *see Sweet v. Bennett,* 353 F.3d 135, 139 (2d Cir.2003). Where a petitioner has failed to exhaust his state court remedies and the court to which he must present his claim would deny the claim on procedural grounds, a federal court must also deny the claim as procedurally defaulted. *Coleman,* 501 U.S. at 735 n. 1, 111 S.Ct. at 2557; *see also Grey v. Hoke,* 933 F.2d 117, 121 (2d Cir.1991). Since petitioner has failed to allege the requisite "cause" and "prejudice" for the default and has not attempted to show that a fundamental miscarriage of justice would result should this court decline to review his claim, *see Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565, this claim is precluded from habeas review.

D. Ineffective Assistance of Counsel

Petitioner claims that his trial counsel rendered ineffective assistance based upon his: (1) failure to introduce evidence that the complainant had allegedly lied in a collateral incident involving petitioner; (2) failure to elicit evidence of the complainant's sexual activities; (3) failure to call character witnesses; (4) failure to investigate and challenge the admissibility of the "outcry" tape; (5) failure to investigate and challenge the admissibility of the complainant's ripped clothing; and (6) advice to petitioner to forego a jury trial.[FN7]

FN7. Although this particular claim is unexhausted, *see* discussion *supra* n. 3, it will be examined on the merits pursuant to 28 U.S.C. § 2254(b)(2).

It is undisputed that all of petitioner's claims of ineffective assistance of trial counsel that were considered by the state court were determined on the merits.[FN8] This court is required to accord substantial

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

AEDPA deference to the state court's decision. 28 U.S.C. § 2254(d)(1), (e)(1); *see also Jimenez,* 458 F.3d at 146 (stating that "AEDPA deference is due to [a state court's] rejection of [a petitioner's claim] if that judgment was an 'adjudication on the merits.' ") (internal citation omitted); *Brown v. Artuz,* 283 F.3d 492, 498 (2d Cir.2002).

> FN8. The state trial court denied the majority of petitioner's ineffective assistance claims without conducting a hearing pursuant to N.Y.C.P.L. § 440.30(4)(b) and (c). Although the trial court characterized those claims as being "procedurally barred," section 440.30(4) does not constitute an "independent and adequate state procedural ground" that would preclude federal habeas review of the affected claims. Indeed, application of N.Y.C.P.L. § 440.30(4) constitutes an adjudication on the merits. *See Garcia v. Portuondo,* 104 Fed. App'x. 776, 779 (2d Cir. Jul.19, 2004); *Lou v. Mantello,* No. 98-CV-5542, 2001 WL 1152817, at *9 n. 9 (E.D.N.Y. Sept.25, 2001).

The Sixth Amendment mandates that a criminal defendant be afforded effective assistance of defense counsel. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970)). In order to prevail under a theory of ineffective assistance of counsel, a petitioner must establish that: (1) "counsel's representation fell below an objective standard of reasonableness" measured "under prevailing professional norms" and (2) "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. at 2064, 2068.[FN9] As the Second Circuit has stated, "[t]he *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v.*

*Keane,* 239 F.3d 191, 199 (2d Cir.2001).

> FN9. The performance and prejudice prongs set forth by *Strickland* may be addressed in either order, and if it appears to the reviewing court that the petitioner's claim would clearly fail due to lack of sufficient prejudice, that course should be followed. In addition, if petitioner fails to satisfy the prejudice prong of *Strickland,* it is unnecessary for the court to evaluate whether the performance prong has been met. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.

*7 A court reviewing a claim of ineffective assistance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and this requires that petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (internal citation omitted). In addition, the reviewing court is not permitted to engage in a probing inquiry that would take advantage of the "distorting effects of hindsight." *Id.* Instead, "a court deciding an ... ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. at 2066; *see also Murden v. Artuz,* 497 F.3d 178, 198 (2d Cir.2007), *cert. denied* --- U.S. ----, 128 S.Ct. 1083, 169 L.Ed.2d 823 (2008) (counsel's performance is examined from counsel's perspective at the time of and under the circumstances of trial).

A petitioner cannot prevail under a theory of ineffective assistance merely because there is a disagreement over counsel's trial strategy. *Singleton v. Duncan,* No. 03-CV-561, 2006 WL 73734, at *14 (E.D.N.Y. Jan. 10, 2006). "Among the 'virtually unchallengeable' tactical decisions left to the judgment of trial counsel are the determinations regarding the defense strategy adopted at trial." *Gluzman v. United*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

*States,* 124 F.Supp.2d 171, 174 (S.D.N.Y.2000) (citing *United States v. Simmons,* 923 F.2d 934, 956 (2d Cir.1991)). *See also Strickland,* 466 U.S. at 690-91, 104 S.Ct. at 2066 (stating that "strategic choices made after thorough investigation of law and facts ... are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Henry v. Poole,* 409 F.3d 48, 63 (2d Cir.2005); *Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir.2005).

The Appellate Division affirmed the denial of petitioner's motion to vacate, finding that he "failed to establish, prima facie, that there were no strategic or other legitimate explanations for counsel's alleged shortcomings or that [petitioner] was deprived of meaningful representation." *Williams,* 24 A.D.3d at 575-76, 805 N.Y.S.2d 295. Under the AEDPA, factual findings made by a state court "shall be presumed correct" and the petitioner has the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *See Rice v. Collins,* 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006). With regard to petitioner's first five ineffective assistance of trial counsel claims, petitioner has failed to meet his burden of rebutting the trial court's findings by clear and convincing evidence as required under 28 U.S.C. § 2254(e)(1). Furthermore, the Appellate Division's affirmance of the trial court's decision was not contrary to, nor did it involve an unreasonable application of, the *Strickland* standard.

**\*8** In any event, petitioner has failed to rebut the strong presumption of effective assistance with a showing that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. When taken in the aggregate, and in light of all the surrounding circumstances, petitioner's first five claims

of ineffective assistance strongly support the notion that trial counsel did in fact engage in sound trial strategy when evaluated from counsel's perspective at the time such decisions were made. *See id.* at 689-90, 104 S.Ct. at 2065 (stating that "a fair assessment of attorney performance requires [a reviewing court] ... to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). After careful review of the entire record and all supporting documentation relating to these first five allegations of ineffective assistance, petitioner's trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. Since petitioner has failed to make a sufficient showing under the "performance" prong of *Strickland,* these claims are without merit.[FN10]

> FN10. Because petitioner has failed to meet the "performance" prong of *Strickland* as to these five claims, whether petitioner could have met his burden with respect to the "prejudice" prong of the inquiry need not be examined. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069 (stating that "there is no reason for a court to ... address both components of the inquiry if the defendant makes an insufficient showing on one.").

Petitioner's final argument in support of his claim of ineffective assistance is similarly without merit. Though petitioner conclusorily asserts in his petition that "counsel advised him not to have a trial by jury saying, it would be a waste of time and too much work for [counsel]," (Petition at 6), and that counsel bribed him to forego a jury trial by "giving [petitioner] one thousand dollars by way of reducing his attorney's fees," *id.,* there is no evidence in the record that corroborates those claims.[FN11] *See Utenyshev v. Portuondo,* No. 00-CV-6529, 2003 WL 21499841, at *12 (E.D.N.Y. June 11, 2003) (finding petitioner's claims of ineffective assistance of trial counsel to be merit

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

less where petitioner proffered no extrinsic evidence in support of his claims and where evidence in the trial transcript directly refuted the allegations); *Johnson v. Fisher,* No. 04-CV-5120, 2006 WL 1912737, at *4 (E.D.N.Y. July 11, 2006) (finding petitioner's unsupported allegations that his attorney coerced him into foregoing a jury trial to be without merit where the record clearly illustrated that petitioner's waiver was knowingly, intelligently and voluntarily given).

> FN11. The record in this case actually refutes petitioner's claim as it clearly demonstrates that petitioner was advised of his right to a jury trial after which he knowingly and voluntarily waived this right. (Tr. at 70). For example, the trial judge explicitly asked petitioner before trial whether he had discussed this choice with his attorney to which petitioner responded "yes." In addition, the jury trial waiver was reduced to writing and signed by petitioner and his attorney in open court after which it was made a court exhibit. Tr. at 69, 71. *See, e.g.* Fed.R.Crim.P. 23(a) (requiring that the right to jury trial be waived explicitly in writing); *McMahon v. Hodges,* 382 F.3d 284 (2d Cir.2004) (stating that "an accused may waive even fundamental rights if the proper safeguards are in place to ensure that the waiver is voluntary and intelligent"); *Johnson v. Fisher,* No. 04-CV-5120, 2006 WL 1912737, at *4 (E.D.N.Y. July 11, 2006) (stating that a defendant's jury trial waiver will be considered valid "so long as the waiver is knowingly, intelligently and voluntarily given").

In any event, though the right to trial by jury in criminal cases is a fundamental constitutional right, *see Duncan v. Louisiana,* 391 U.S. 145, 157-58, 88 S.Ct. 1444, 1452, 20 L.Ed.2d 491 (1968), a defendant may waive the right to a trial by jury. *Id.* at 158, 88 S.Ct. at 1452. Whether to forego a jury trial in a par-

ticular case is generally regarded as a tactical decision fairly encompassed within the overall defense strategy utilized by counsel. *See United States v. Ortiz Oliveras,* 717 F.2d 1, 4-5 (1st Cir.1983) (holding that defense counsel did not render ineffective assistance in pursuing a bench trial where the evidence against defendant was strong and counsel could have reasonably determined that the chance of acquittal was more likely if the trial was held before a judge rather than a jury and where defendant voluntarily agreed to the strategy at the time); *Steele v. United States,* No. 04 Civ. 6918, 2005 WL 704868, at *12 (S.D.N.Y. Mar.29, 2005) (finding defense counsel's strategy of pursuing a bench trial was not deficient considering the overwhelming evidence against the defendant): *Davila v. Sullivan,* No. 87 Civ. 2981, 1987 WL 19958, at *2 (S.D.N.Y. Nov.10, 1987) (finding that trial counsel's advice to forego a jury trial was "a tactical decision which cannot constitute ineffective assistance."); *Morales v. United States,* No. 97 CIV. 3892, 1998 WL 171448, at *1 (S.D.N.Y. Apr 14, 1998) (stating that "counsel's [strategic] decision to waive a jury ... was more than reasonable" where the record demonstrated that the waiver was voluntarily made by petitioner). Therefore, counsel's encouragement to forego a jury trial in the instant case does not constitute ineffective assistance, especially in light of the underlying crimes at issue in this case which would likely inflame a lay jury, and the overwhelming evidence of petitioner's guilt. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066; *see also Steele,* 2005 WL 704868, at *12 (opining that "defense counsel's strategy of pursuing a bench trial was sound, or at the very least not deficient, considering the overwhelming evidence against [defendant].". Since petitioner has failed to demonstrate that his counsel's determination to forego a jury trial was a choice that existed outside of the "wide range of reasonable professional assistance" afforded to trial counsel under the "performance" prong of *Strickland,* this claim is without merit.

### III. CONCLUSION

**\*9** The petition for a writ of habeas corpus is de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)
**(Cite as: 2008 WL 4179475 (E.D.N.Y.))**

nied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; *see also Miller-El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); *Luciadore v. New York State Div. Of Parole,* 209 F.3d 107, 112 (2d Cir.2000); *Kellogg v. Strack,* 269 F.3d 100, 102 (2d Cir.2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

E.D.N.Y.,2008.
Williams v. Breslin
Not Reported in F.Supp.2d, 2008 WL 4179475 (E.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.